WILLARD M. ARNOLD AND DOROTHY N. ARNOLD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CARNEGIE MULTI INTERNATIONAL CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Arnold v. Commissioner
Docket Nos. 30491-84, 37582-84
United States Tax Court
T.C. Memo 1994-97; 1994 Tax Ct. Memo LEXIS 97; March 7, 1994, Filed *97 Decision will be entered under Rule 155. For petitioners: Gary S. Cook and George Ortiz For respondent: John C. McDougal
KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Petitioner
Docket No.
Year
Deficiency
Sec. 6653(a)
Sec. 6653(b)
Willard M. and
30491-84
1980
$ 1,050,201.14
$ 52,510.06
--  Dorothy N.
Arnold
Carnegie Multi
37582-84
1981
155,882.41
--  $ 77,941.21
International
Corp.
After concessions, [1] the issues for decision are: (1) Whether the bargain element of a sale-leaseback transaction between two related corporations is constructive dividend income to petitioner Willard M. Arnold (hereinafter Arnold), as the controlling shareholder of both corporations; (2) whether corporate reimbursements for travel and entertainment expenditures are also constructive dividend income to Arnold; (3) whether Arnold is liable for additions to tax for negligence pursuant to section 6653(a); and (4) whether petitioner Carnegie Multi International Corp. (hereinafter CMI) is liable for additions to tax for *98 fraud pursuant to section 6653(b) due toits omission of gain on the sale of 13,300 shares of stock. Unless otherwise indicated, statutory references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and attached exhibits are incorporated by this reference unless otherwise indicated. Petitioners Willard M. Arnold and Dorothy N. Arnold are husband and wife who resided at 133 Island Drive, Ocean Ridge, Florida, on August 27, 1984, the date of filing their petition in this case. The parties have stipulated that petitioner Dorothy N. Arnold is a section 6013(e) *99 innocent spouse with respect to all issues, deficiencies, and additions to tax determined by respondent. CMI's principal place of business on November 1, 1984, the date of filing its petition in this case, was Akron, Ohio. 1. Arnold's Ownership of CMI and Related Corporations
Arnold owned and controlled the activities of several corporations as president, director, and sole or majority shareholder. A description of the relationships between these organizations, their business activities, and Arnold's involvement, is necessary to an understanding of the transactions at issue. Three corporations are relevant to the issues herein: Hughes-Burton, Inc. (hereinafter HB), CMI, and Arnold Graphics Industries, Inc. (hereinafter AGI). AGI was formed in 1961 from the consolidation of a manufacturing company and several small organizations selling business forms. AGI became engaged on a national level in the design, manufacture, sale, and distribution of business forms and related paper products principally to industrial, financial, and Government customers. Approximately 65 percent of the forms manufactured were continuous feed forms used in data processing systems. AGI was Arnold's *100 principal business enterprise. By 1980, AGI operated six manufacturing plants which encompassed 480,000 square feet of space. CMI's and AGI's operations were interdependent. CMI was incorporated November 13, 1975, as a wholesale paper broker to establish a dependable source of supply for AGI's principal raw material, paper. For its fiscal year ending September 30, 1980, AGI purchased approximately $ 21,759,000 worth of paper from CMI, nearly 31 percent of AGI's cost of products sold. During 1980, CMI's paper brokerage business was conducted principally at AGI's corporate headquarters. Arnold reported wages from AGI and CMI for 1980 in the amounts of $ 300,000 and $ 57,059.63, respectively. As per AGI's financial statements, AGI's total assets on September 30, 1980, were $ 44,588,260, and for the 9 months ended September 30, 1980, net sales and net earnings were $ 91,926,111 and $ 2,666,353, respectively. As per CMI's tax return, CMI's total assets on April 30, 1981, were $ 8,608,331, and for the fiscal year ended April 30, 1981, its net sales and after-tax income were $ 23,491,183 and $ 1,989,754, respectively. HB was incorporated October 1, 1974, and its principal business *101 activity was real estate. Rental income is HB's primary source of revenue, and depreciation is taken each year on a building which notably is HB's only fixed asset. HB leases this building to AGI or another Arnold affiliate. 2. Arnold's Ownership of HB, CMI, and AGI
In spite of representations made by Arnold to the contrary at various times and places, with regard to his stock ownership in various corporations, this Court finds that Arnold for the years in question did in fact own and control 100 percent of HB. Arnold, through his 100-percent ownership of HB, was also the beneficial and controlling owner of CMI. Arnold wholly owned HB and HB wholly owned CMI. In other words, CMI was the 100-percent subsidiary of HB. On December 1, 1980, Arnold beneficially owned 347,172 shares or 57.3 percent of AGI. This figure includes 109,226 shares owned by companies affiliated with Arnold, of which CMI owned 103,766 shares. 3. Sale of AGI Stock
The business forms industry is highly competitive. In 1980, there were at least five forms manufacturers, each with annual sales in excess of $ 100 million. These five companies dominated the forms industry nationally. AGI believed *102 it had a competitive product line and certain unique marketing strategies; however, AGI, unlike some of its competitors, did not sell business machines that used its business forms. Arnold had been president and chairman of AGI's board of directors since its incorporation. From time to time he received inquiries from suitors seeking to purchase AGI. From 1977 to 1980, AGI held discussions with six such suitors. In three instances, however, no offer was received. Arnold rejected one offer due to uncertainty regarding the source of financing. A foreign offer was also rejected because it contemplated the liquidation of AGI and the sale of its assets. Arnold, as AGI's majority shareholder, preferred and ultimately accepted an offer made by Carl Marks, a New York investment firm and securities dealer representing the buyers, Prudential and Teachers (hereinafter purchasers or buyers). AGI and its purchasers deemed a stock sale desirable and in the best interests of each of the constituent corporations and their respective shareholders. The transaction was the result of arm's-length negotiations between AGI and the principals and entities who acquired AGI, neither having any prior *103 business or personal relationship, affiliation, or association with the other. Carl Marks created CM-Graphic Acquisition, Inc. (hereinafter CM-G), for the purpose of facilitating the sale of AGI's stock. CM-G had not previously engaged in business. On September 18, 1980, CM-G officially submitted an offer of $ 49.50339 per share to AGI's shareholders upon presentment of their stock certificates. This $ 49.50339 price was approximately 50 percent above the net book value of AGI's shares. Following the sale, AGI would become CM-G's wholly owned subsidiary. AGI's stock was not publicly traded, and the stock buyout permitted shareholders, principally Arnold and his family who directly owned 237,946 shares, to dispose of an illiquid investment at a substantial gain. On December 22, 1980, the record date of ownership change, AGI had 606,019 shares outstanding; the cost of purchasing all the outstanding stock of AGI would therefore total $ 30 million in consideration. After the purchase, all of the outstanding stock of AGI was owned by CM-G. The offer by CM-G provided for a closing date of January 15, 1981. CM-G placed several conditions (although waivable) on AGI before the sale *104 could proceed. One such condition required AGI's financial statements for the period ended September 30, 1980, to reflect specific thresholds for pretax profit, net worth, total debt, and a figure by which AGI's assets must exceed liabilities. Also required was AGI's termination of all agreements or other business arrangements with CMI. CMI would also agree in writing to cause all business opportunities relating to the business offered to CMI or to which CMI acquired knowledge to be offered to AGI or its parent CM-G. The record does not disclose the impact of this agreement on CMI's business. Management proceeded to "clean up AGI" so it would sell quickly and easily. AGI's consolidated balance sheets reflect such an effort. From September 30, 1979, to September 30, 1980, current liabilities decreased from $ 21,977,595 to $ 15,751,008, and for the same period, total liabilities decreased from $ 30,699,484 to $ 24,052,626. AGI's business and its name would remain relatively intact after this change in ownership. This ownership change was accomplished as a "leveraged purchase or buyout" whereby the assets of AGI, or more accurately AGI's net worth, provided the borrowing base *105 for purchaser CM-G to finance the acquisition. Arnold remained chief executive officer and president, as well as one of AGI's directors, along with two CM-G designees. CM-G continued to employ AGI's management at present salaries, pursuant to 5-year contracts. Based on the performance of AGI and CM-G after this transaction, senior management were also eligible to participate in a newly instituted incentive compensation program. The principals also agreed that Arnold, three other AGI executives, and a trust created for the benefit of Arnold's descendants would purchase 20 percent of CM-G's common shares and 23 percent of its preferred stock for $ 100,000 and $ 300,000, respectively. Arnold purchased his equity investment in CM-G for $ 385,000; therefore, his ownership interest in CM-G after the sale of AGI's stock was somewhat less than the percentages stated above. A few years after this stock buyout, Arnold was removed as president, chief executive officer, and as one of AGI's directors due to disputes with AGI's new owners. During May 1984, Arnold was offered $ 2.5 million for his equity interest in CM-G. 4. Bargain Sale-Leaseback of Three Properties Between AGI and *106 CMI Before AGI's Ownership Change
The principal transaction at issue in this case involves AGI's bargain sale of land, land improvements, and buildings comprising its Solon and Akron, Ohio, and Hagerstown, Maryland, facilities to CMI, with a corresponding leaseback to AGI. AGI's principal production facilities are located on these premises. The sale was executed for AGI by Arnold unilaterally in September 1980 after negotiations had begun between CM-G and AGI but before the official offer had been made to AGI shareholders. The stated purpose for the sale-leaseback arrangement was the improvement of AGI's cash flow and retrieval of its capital investment without giving up occupancy of its premises. The sale price of the facilities, $ 1,258,260, was equal to their net book value; AGI did not report any gain or loss on this sale. The parties hereto have agreed that according to subsequent appraisals, the properties had an aggregate value of $ 1,860,000. [2] Therefore, the bargain element was $ 601,740, not the stipulated $ 602,000 figure. CMI paid $ 314,565 down on the $ 1,258,260 purchase price and gave AGI an installment note for the balance of $ 943,695. The note required *107 five annual installments of $ 188,739 at 12-percent interest. The lease provided for monthly rental payments of $ 12,582 (an amount reflective of the sale price), which totaled $ 150,984 annually. As part of the agreement to buy AGI stock, CM-G required and executed amendments to this new lease on January 20, 1981, providing for an option in favor of AGI to repurchase the properties leased and extending the lease terms from 1990 to 1996 on the Akron property, and to 1997 on the Solon and Hagerstown properties. There is no evidence that these properties were repurchased. As of December 31, 1980, there existed sufficient earnings and profits in AGI to support the constructive dividend determination by respondent. 5. Travel and Entertainment Expense Reimbursements Paid by AGI Directly to Arnold or His Creditors
Arnold submitted to AGI for reimbursement handwritten monthly travel and entertainment *108 reports which categorized and summarized such expenses. AGI correspondingly issued checks directly to Arnold and to the following specified creditors. In support of such handwritten expense reports, Arnold primarily provided receipts in the form of credit card statements, country club, and telephone bills. Arnold's reimbursements which AGI deducted as travel and entertainment on its 1980 income tax return follow: Payee
Amount
Arnold
$ 28,802.06
Master Card
6,722.55
United Airlines
3,361.00
Prestwick Country Club
1,017.40
Total
$ 39,903.01
6. CMI's Sale of AGI Stock and Arnold's Individual Retirement Account (IRA) Account
On January 20, 1981, as part of the leveraged buyout previously discussed, CMI presented all its 103,766 shares of AGI stock to Continental National Bank in exchange for the $ 49.50339 per share rate offered to AGI shareholders, for a total of $ 5,136,768.70. On its corporate income tax return for fiscal year ending April 30, 1981, CMI reported the sale of only 90,466 of these shares. At the direction of Arnold, CMI did not, but should have, reported the sale of the other 13,300 shares of AGI stock which CMI in fact owned. Respondent's *109 adjustments in the notice of deficiency issued to CMI accordingly increased CMI's long-term capital gain by $ 525,395.09, a figure which reflected sale proceeds of $ 658,396.09 and a cost basis of $ 133,000. Arnold opened an IRA with Central National Bank (hereinafter bank) on September 20, 1977, from a rollover contribution in the amount of $ 104,304.33. The bank's custodial agreement informed Arnold not only that distributions were possible if he filed a declaration of intent stating the reason for withdrawal and his intention regarding the disposition of amounts distributed, but also that the assets of a custodial IRA could not be commingled with other property, and that the bank would submit reports to the Internal Revenue Service as required by law. Arnold's IRA account balance increased only with accruals of interest until it reflected a balance of $ 135,136.45 on January 1, 1981. On February 27, 1981, Arnold contributed the $ 658,395.09 of proceeds from the sale of AGI's stock into his IRA indicating to bank representatives and signing a statement to the effect that this contribution was another rollover from another IRA or qualified retirement plan. Also, on February *110 27, 1981, Arnold directed the withdrawal of $ 133,000 from his IRA for the stated purpose of repaying loans due to CMI. As directed, the bank issued a check in favor of CMI for the $ 133,000 distribution. Of the $ 658,395.09 proceeds deposited into Arnold's IRA account, two checks were included in the deposit. Both checks were issued from CMI's Cowen & Co. stock brokerage account; one was payable to Arnold for $ 222,075.67, and the other was payable to CMI for $ 436,319.42. CMI's records for 1980 show an entry in its notes payable ledger which increased the account in favor of Arnold in the amount of the $ 222,075.67 check. Arnold represented to CMI return preparer William Palmer, as well as to bank representatives, that his IRA owned the 13,300 shares; therefore, any gain would not be subject to tax until the funds contributed were withdrawn. When asked by the revenue agent, the power of attorney for Arnold also stated that during May 1980, Arnold's IRA had purchased the AGI stock from CMI. When asked by Jeffrey L. Rooney, executive vice president of the bank, what Arnold intended to do with the $ 133,000 distribution taken from his IRA, Arnold stated he wished to repay a $ *111 133,000 loan from CMI. Arnold's own handwritten notes indicated that he had purchased these 13,300 shares. As can be discerned from the above, Arnold has two explanations for the foregoing activities. Arnold himself or his IRA supposedly purchased the unreported 13,300 shares of AGI stock directly from CMI sometime in May 1980 at $ 10 per share. Also, the funds used to make the purchase came from either of two sources, from Arnold's own IRA account or from CMI. Arnold lends support to one story about what happened on February 27, 1981, by claiming he contributed the $ 658,395.09 in proceeds from the sale of the 13,300 shares to his IRA, and simultaneously withdrawing $ 133,000 from his IRA to allegedly pay off the funds he claimed he borrowed from CMI and used to purchase the AGI shares. Arnold supports the other story by pointing to the $ 135,136.45 balance in his IRA on January 1, 1981, and suggesting that these funds were used to purchase the 13,300 shares at $ 10 per share. Arnold supports these numbers with a stock quotation report which indicated average bid prices for AGI stock during 1980 at $ 10 per share. In fact, a distribution was never withdrawn from Arnold's *112 IRA in 1980 to purchase AGI stock or for any other purpose, as the IRA's account balance was carried over to 1981 without any additions for contributions or deductions for distributions. Also, no record has been offered into evidence to substantiate Arnold's assertion that he or his IRA purchased the 13,300 shares of AGI stock from CMI. During his examination of CMI, the revenue agent similarly found no evidence of such a sale on CMI's books and records or AGI's stock ledger book. Arnold also did not allow the sale of 13,300 shares of AGI stock to either himself or his IRA to be reflected on CMI's corporate tax return for the fiscal year beginning May 1, 1980, and ending April 30, 1981. OPINION 1. Constructive Dividend to Common Shareholder Arnold of Bargain Element in Sale Between AGI and CMI
In the present case, we delve into the realm of the constructive dividend where it is not necessary for a corporation to formally declare a cash dividend or to directly distribute property to a shareholder for dividend consequences to occur. Wilkof v. Commissioner, T.C. Memo. 1978-496, affd. 636 F.2d 1139 (6th Cir. 1981). *113 A distribution of property made by a corporation to a shareholder with respect to his stock is taxable as dividend income to the extent of corporate earnings and profits. Secs. 301(a), (c), 316(a); sec. 1.301-1(c), Income Tax Regs. A transfer of property from one corporation to a related corporation may constitute a dividend to common shareholders even though these shareholders do not receive funds or property from either corporation. The standard for determining when a transfer between related corporations constitutes a dividend to common shareholders consists of two tests. They include an objective distribution test and a subjective test of primary purpose, both of which must be met. Stinnett's Pontiac Service, Inc. v. Commissioner, 730 F.2d 634, 641 (11th Cir. 1984), affg. T.C. Memo. 1982-314. First, there must be a distribution from the transferring corporation's earnings and profits; the transferee corporation must receive something at the expense of the transferor. This test requires property to leave the control of the transferor corporation in a way that allows a common shareholder thereafter to control *114 the transferred property through some other instrumentality, directly or indirectly. When a transfer of property takes place between two related corporations, a common shareholder does not directly receive property or funds from the transferor corporation; therefore, a distribution occurs when a transferee corporation attains an increase in control at the expense of a transferor corporation. This divestment of corporate control is a relevant inquiry in determining whether a distribution has occurred. The amount of such distribution is measured by the loss to the transferring corporation. Sammons v. Commissioner, 472 F.2d 449, 451, 453 (5th Cir. 1972), affg. in part, revg. in part and remanding T.C. Memo. 1971-145; Stinnett's Pontiac Service, Inc. v. Commissioner, T.C. Memo. 1982-314, affd. 730 F.2d 634 (11th Cir. 1984); Sparks Nugget, Inc. v. Commissioner, T.C. Memo. 1970-74, affd. 458 F.2d 631 (9th Cir. 1972). Here, there is no question that AGI transferred property to CMI at a bargain price. AGI and *115 CMI are primarily related as brother-sister corporations; to the extent that they are related as parent-subsidiary corporations, such relationship is irrelevant due to the fact that the transfer here was upstream. See Sammons v. Commissioner, supra at 453. The transfer of AGI's production facilities to CMI is sufficient to pass the first test, and the amount of the constructive distribution to Arnold is the total bargain element of the properties transferred. The second test is designed to differentiate between normal business transactions of related corporations and those designed primarily to benefit a common shareholder. The primary or dominant motivation for a distribution must be examined. Sammons v. Commissioner, supra at 451-452. Due to Arnold's burden of overcoming the correctness of respondent's determination that he constructively received such a dividend, Arnold must advance a legitimate corporate or business justification which is the primary cause for the transfer and which is sufficient to overcome the conclusion that the shareholder primarily benefited from the distribution. A corporate *116 purpose must demonstrate the necessary relationship between the transferor and the transferee corporation such that the distribution would be in the best interests of the transferring corporation. If justifiable business reasons exist that account for the transfer, such reasons will suffice to override any incidental or derivative benefit to a common shareholder. Wilkof v. Commissioner, T.C. Memo. 1978-496. However, where a corporation's distribution serves no legitimate corporate purpose, it must be treated as a constructive dividend to the benefited shareholder. Commissioner v. Riss, 374 F.2d 161, 167 (8th Cir. 1967), affg. in part, revg. in part and remanding T.C. Memo. 1964-190. Determining how each corporation benefits is crucial to determining who is the primary beneficiary in this sale-leaseback transaction. In pursuing the primary purposes for the sale-leaseback between AGI and CMI, we first examine the financial consequences to each corporation. AGI's annual lease rental payment due to CMI was $ 150,984, and CMI's annual installment payment due to AGI for financing the acquisition *117 was $ 188,739, plus a 12-percent annual interest expense which CMI must pay to AGI over 5 years. In terms of cash-flows, this transaction will cause CMI to experience a net negative cash outgo for the first 5 years following the sale, until CMI has fully financed the acquisition. On the other side of the equation, AGI will enjoy a net cash influx for the next 5 years. Thereafter, the situation reverses so that CMI and (AGI), respectively, will receive and (pay) $ 150,984 per year in rental income and (expense). During the year of sale, the assets sold by AGI were removed from its property, plant, and equipment account and were replaced by the note receivable due from CMI. Also, AGI's working capital was increased by CMI's $ 314,565 downpayment. While the financial consequences somewhat support AGI's stated purpose of increasing its short-term cash-flows and providing it with a reasonable lease payment, we cannot help but notice that the transaction also depleted AGI of a $ 601,740 gain which AGI would otherwise have recognized had the sale been arm's length and which would have increased AGI's cash-flows further in terms of the financing dollars receivable from CMI. While we *118 do believe that AGI, or rather Arnold, did engage in a financial cleanup to facilitate the sale of stock, we do not believe that the sale-leaseback arrangement was entered into primarily for this purpose. The effect on the financial statements of the sale-leaseback transaction, while helpful, is not significant enough to be determinative. The ongoing negotiations between CM-G and AGI regarding the sale of AGI stock is very revealing. During these negotiations, Arnold necessarily was wearing two very different hats, each with directly conflicting concerns. We feel it was virtually impossible for Arnold as the majority shareholder and principal officer of AGI to negotiate for the best possible price in the sale of his stock and to, at the same time, also be genuinely concerned with the financial future of such corporation. Arnold's actions reveal that he no longer had either corporation's best interests in mind. The stock sale allowed Arnold and other AGI shareholders to handsomely cash out their illiquid investments. AGI did in fact experience financial difficulties in years following the stock sale. Neither corporation tangibly benefited from the sale-leaseback. Of greatest *119 significance is AGI's loss of control over two of its principal manufacturing facilities in exchange for an obligation to pay rent. Even more questionable is that CMI, a paper broker, purchased manufacturing facilities it could never possibly utilize. We cannot imagine CMI's business purpose in purchasing land and production facilities when its operations were principally conducted out of an office at AGI's headquarters. Arnold executed the sale-leaseback between AGI and CMI principally for his own benefit with little or no legitimate business purpose. We note that Arnold, at 61 years old, was near retirement when CM-G offered to buy AGI stock from its shareholders. Arnold and his family realized $ 11,779,133.63 in proceeds from the sale of 237,946 shares. While exchanges of stock are not taxable as dividends, this sale and its benefit to Arnold cannot be overlooked. Arnold was an entrepreneur whose principal business interest had been AGI. Arnold pursued an end result which allowed him to maintain future negotiating leverage with CM-G by retaining control over AGI's principal production facilities. This leverage allowed Arnold to "sweeten" the deal and jack up the price *120 for his interest in AGI stock by his agreement with CM-G to extend the length of AGI's lease terms and to insert a repurchase option in favor of CM-G. Arnold was principally interested in maximizing the return on his investment in AGI, and at the same time, he succeeded in retaining some control over AGI's destiny. This control seems to have partly precipitated disputes with AGI's new owners and to have ultimately resulted in CM-G's offer to buy out Arnold's equity interest in CM-G and his ousting from any further association with AGI. Arnold argues that the transfer of the unrealized value in AGI's properties to CMI is not a sufficiently direct economic transfer, but is merely of incidental or incremental benefit to him. Arnold seems to confuse a direct benefit with a direct transfer. The underpinnings of the constructive dividend rest on the very fact that such transfers of value are not direct transfers of cash. Therefore, to determine which transfers create income, the courts weigh the benefits involved. Additionally, this Court and others have held that the enhancement in value of an equity interest is a sufficiently direct economic benefit to a shareholder to impute dividend *121 income. See Sparks Nugget, Inc. v. Commissioner, T.C. Memo. 1970-74. Accordingly, we find that Arnold realized a constructive dividend of $ 601,740, due to the bargain sale-leaseback transaction between AGI and CMI. 2. Constructive Dividend Treatment of Travel and Entertainment
Arnold offered receipts substantiating the amounts submitted to AGI for reimbursement. However, he failed to offer any evidence of a business relationship to the persons entertained or a business purpose for the expenditures, as required by section 274(d)(3). Arnold argues correctly that even though these travel and entertainment expenses are not deductible by AGI because they have not been properly substantiated according to section 274(d), this fact alone does not necessarily equate these payments with constructive dividend income. Ashby v. Commissioner, 50 T.C. 409, 418 (1968). Arnold however, must carry his burden of proving that these amounts were not expended for his personal benefit or in discharge of his personal obligations. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650, 663 (1962). *122 While it may be that these expenses were legitimate business expenses, we have no basis on which to make such a determination. Arnold chose not to testify; therefore, this Court is left with bare receipts for facially very personal expenditures, such as gas, food, lodging, and phone calls. We have absolutely no proof that they were incurred for any business purpose or benefit. Arnold has totally failed to meet his burden on this issue; therefore, we have no choice but to hold that Arnold personally benefited from all such reimbursements. 3. Negligence Additions Against Arnold Under Section 6653(a)
For 1980, section 6653(a) provides that where any part of an underpayment of income tax is due to negligence or intentional disregard of rules and regulations, an amount equal to 5 percent of the entire underpayment shall be added to the tax. Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Arnold asserts that he reasonably relied on the expertise of AGI's corporate accountant, William Palmer, to properly account *123 for all transactions material to AGI's financial statements and that AGI's auditors, Touche Ross, reviewed the financial statements which reported the sale-leaseback transaction and did not require a modification for tax or accounting purposes. Arnold cannot rely on the corporation's accountant or Touche Ross for the proper treatment of items on his 1980 personal Form 1040, Individual Income Tax Return, primarily because no one signed as preparer on such return, and this Court does not believe that anyone in AGI's employ knew the true nature of affairs other than Arnold, who did not testify. The testimony of AGI's vice president, Richard Stanley, reflects a blind following of Arnold's directions by those in AGI's employ. Stanley felt it was his duty to do as he was told without asking questions. He signed blank checks and stock certificates. He also signed as an officer of CMI on its fiscal 1980 U.S. Corporation Income Tax Return, attesting under penalties of perjury that he had examined the return for correctness and completeness without turning beyond the first page to review the return. Also, the review of the financial statements by Touche Ross, although reflective of the *124 sale-leaseback transaction, was not a review of Arnold's personal return. This Court has on occasion found taxpayers not liable for additions due to negligence when the complexity of the factual and legal determinations involved in a constructive dividend issue creates honest differences of opinion. Carter v. Commissioner, T.C. Memo. 1977-322. Here, however, Arnold alone possessed knowledge of all the facts and circumstances involved in the sale-leaseback transaction. He has not put forth any evidence indicating that he acted reasonably by requesting professional advice regarding the tax consequences to him personally. Arnold has not advanced any further arguments, and therefore, he has failed to carry his burden of proving that the underpayment was not due to his negligence. Enoch v. Commissioner, 57 T.C. 781, 803 (1972). 4. Fraud Additions Against CMI Under Section 6653(b)
To establish fraud, respondent must prove by clear and convincing evidence that: (1) An underpayment exists; and (2) petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the *125 collection of tax. Rule 142(b); sec. 7454(a); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990). CMI conceded at trial the $ 155,882.41 deficiency due to its failure to report the sale of 13,300 shares of AGI stock. The only disputed question is whether CMI had the requisite fraudulent intent. This is a question of fact to be determined on consideration of the entire record. Parks v. Commissioner, supra at 660. Fraud is an actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. A corporation does not escape responsibility for the acts of its officials, through whom all corporations necessarily must act. Corporate fraud depends on the fraudulent intent of a corporate officer which can be imputed to the corporation. Federbush v. Commissioner, 34 T.C. 740, 749 (1960), affd. 325 F.2d 1 (2d Cir. 1963). Arnold, as president and 100-percent owner of CMI, alone *126 controlled and directed the operations of CMI. His intentions are imputed to CMI. Fraud may be inferred from conduct the effect of which is to mislead or conceal. Spies v. United States, 317 U.S. 492, 499 (1943). CMI argues that its omission of the gain on the sale of 13,300 shares of AGI from its tax return was due to Arnold's innocent and honestly held belief that his IRA constructively owned the AGI shares; therefore, he believed any gain would not be taxed until the funds were withdrawn from his IRA. We disagree. Arnold took the following fraudulent steps in an attempt not only to conceal CMI's ownership of the 13,300 shares of AGI stock and to avoid reporting gain on that sale, but also to benefit himself personally with the wrongful transfer of funds to his IRA. Arnold misrepresented facts to bank representatives, revenue agents, and his own in-house accountants and attorneys. These misrepresentations were specifically described in the facts and need not be repeated here. Arnold's misrepresentations were specifically calculated to avoid inquiry, and his responses to any inquiries were tailored to support his created versions of the facts *127 and to explain away any perceived problems with his activities. Arnold knew the bank would be supplying information to the Internal Revenue Service as required by law and he acted accordingly to conceal his actions. Arnold specifically came up with two stories to explain CMI's failure to report the sale of its 13,300 shares of AGI stock. The creation of two scenarios, on what can only be one set of facts, is sufficient in itself to prove conduct intended to conceal and mislead with the specific purpose herein not only to avoid tax on the gain to CMI and to thereby directly benefit Arnold individually, but to also provide his IRA with pretax dollars to earn tax-deferred income. Arnold did some estate planning in connection with AGI's stock sale, but he went fraudulently further when he continued a tax avoidance estate planning scheme which transferred the proceeds of CMI's 13,300 shares of AGI stock into his personal IRA account. Additionally, Arnold attempted to support each version of events, except he failed to record the sale on the books or records of either CMI or AGI or on CMI's tax return. Respondent has clearly and convincingly demonstrated that what actually occurred *128 was that Arnold deposited CMI's proceeds from the sale of the 13,300 shares directly into his IRA account, stating to bank representatives that it was a proper rollover, and simultaneously attempted to conceal and justify the transaction by requesting a $ 133,000 distribution from the same account, under the pretense of paying back CMI for funds loaned to purchase the stock initially. The $ 133,000 figure was arrived at with the aid of the previously mentioned stock quotation report which reflected that a $ 10 rate was reflective of 1980 bid prices for AGI stock. We agree with respondent that Arnold's effort to show a rational relationship between the $ 10 rate and the amount of the $ 133,000 distribution is an after-the-fact attempt calculated by Arnold to conceal his diversion of the stock sale proceeds and is not representative of actual fact. This transaction is sufficient to prove fraud, and respondent has met the burden of showing that Arnold attempted to conceal his diversion of CMI's proceeds from the sale of its AGI stock by diverting the proceeds into his personal IRA account. To reflect the foregoing and concessions of the parties, Decisions will be entered under *129 Rule 155. Footnotes
1. At trial, petitioner Carnegie Multi International Corp. (CMI) conceded respondent's deficiency of $ 155,882.41, agreeing that CMI should have, but did not report, long-term capital gain associated with the sale of 13,300 shares of Arnold Graphics Industries, Inc. stock.↩
2. Respondent's notice of deficiency reflected a fair market value for these properties in the amount of $ 2,825,000.↩