T.C. Memo. 2002-125

UNITED STATES TAX COURT

EDDIE CORDES, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19027-98, 4815-99,    Filed May 22, 2002.
          4816-99, 4823-99,
          5508-99, 7369-99.

O. Christopher Meyers, for petitioners.

Gary L. Bloom, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  In separate notices of deficiency,
respondent determined the following income tax deficiencies and

[1]Cases of the following petitioners are consolidated herewith:  Eddy B. and Ellen K. Cordes, docket No. 4815-99; Joseph P. and Jean Ann Richard, docket No. 4816-99; John J. and Sue E. Cordes, docket No. 4823-99; Eddie Cordes, Inc. Successor by Merger With Cordes Finance Corp., docket No. 5508-99; and Edmund J. and June J. Cordes, docket No. 7369-99.

penalties with respect to petitioners' Federal income taxes:[2]

<u>Docket No. 19027-98</u>
Eddie Cordes, Inc.:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1992 | $22,453 | $4,491 |
| 1994 | 159,087 | 31,817 |
| 1995 | 41,783 | 8,357 |

<u>Docket No. 4815-99</u>
Eddy B. and Ellen K. Cordes:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1994 | $1,759,679 | $351,936 |
| 1995 | 985,704 | 197,141 |

<u>Docket No. 4816-99</u>
Joseph P. and Jean Ann Richard:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1994 | $1,757,554 | $351,590 |
| 1995 | 980,285 | 196,884 |

<u>Docket No. 4823-99</u>
John J. and Sue E. Cordes:

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 1994 | $1,970,294 | $394,059 |
| 1995 | 972,618 | 194,523 |

---

[2]All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

Docket No. 5508-99
Eddie Cordes, Inc. Successor by Merger with Cordes Finance Corp.:

| Year | Deficiency | Accuracy-related penalties sec. 6662(a) | Fraud penalties sec. 6663 |
|------|-----------|------------------------------------------|----------------------------|
| 1994 | $328,625  | -0-       | $246,654 |
| 1995 | 298,393   | $59,861   | (685)    |

Docket No. 7369-99
Edmund J. and June J. Cordes:

| Year | Deficiency | Accuracy-related penalties sec. 6662(a) | Fraud penalties sec. 6663 |
|------|-----------|------------------------------------------|----------------------------|
| 1994 | $1,806,379 | $211,212 | $562,739 |
| 1995 | 1,162,589  | 108,851  | 463,750  |

Separate petitions were filed contesting respondent's determinations. These cases present common issues of fact and law and were consolidated for trial, briefing, and opinion pursuant to Rule 141(a).

After concessions,[3] the only issues for decision are:

1) Whether any of the individual petitioners received constructive dividends from Cordes Finance Corp. (CFC) and/or Eddie Cordes, Inc. (ECI), in 1994 and/or 1995, and, if so, in what amounts;

2) whether interest earned on certain notes in 1994 and 1995 is properly included in CFC's or Edmund J. Cordes's (Mr.

_____

[3]Many issues in these consolidated cases have been settled or conceded by the parties or are deemed by this Court to be conceded. Other issues raised by the parties are computational in nature. In the interest of space, these conceded, deemed conceded, computational, and settled issues, and their respective dispositions, are set forth in Appendix, Summary of Conceded, Deemed Conceded, Computational, and Settled Issues. We incorporate those dispositions into our opinion by this reference.

Cordes's) income and, if properly included in Mr. Cordes's income, whether that interest is income from self-employment;

3)   whether CFC may properly deduct from income repossession costs in 1994 and 1995;

4)   whether any of the petitioners are liable for the accuracy-related penalty pursuant to sec. 6662(a) for 1994 or 1995; and

5)   whether CFC and Mr. Cordes are liable for the fraud penalty pursuant to sec. 6663(a) for 1994 or 1995.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the two supplemental stipulations of facts are incorporated herein by this reference, except as specifically noted below. At the time the petitions in these cases were filed, ECI's principal place of business was in Lawton, Oklahoma; Eddy Ben and Ellen K. Cordes resided in Lawton, Oklahoma; Joseph P. and Jean Ann Richard resided in Lawton, Oklahoma; John J. and Sue E. Cordes resided in Austin, Texas; and Edmund J. and June J. Cordes (the Cordeses) resided in Lawton, Oklahoma. Eddy Ben Cordes, Jean Ann Richard, and John Cordes are the Cordeses' children. We refer to the Cordeses together with their children as the Cordes family.

I.   Corporate Ownership

ECI was incorporated in Oklahoma in January 1963 as an authorized dealership for Jeep-Eagle vehicles. CFC was incorporated in January 1964 and operated mainly to finance new

and used vehicles purchased by customers from ECI and other car dealerships owned by Mr. Cordes. In 1997, CFC merged into ECI, with ECI surviving as the successor corporation.

During the taxable years at issue, members of the Cordes family held legal title to all the shares of stock in CFC and ECI. On January 1, 1994, Jean Ann Richard and John Cordes each held legal title to 33.3 percent of the shares of stock in CFC, and June J. Cordes (Mrs. Cordes) held legal title to the remaining 33.4 percent of the shares of stock in CFC. On January 14, 1994, Mrs. Cordes transferred her legal title to Eddy Ben Cordes. Cordes v. Commissioner, T.C. Memo. 2002-124. No further transfers of stock in CFC took place in the years at issue. At all times during the years at issue, Eddy Ben Cordes held legal title to 100 percent of the shares of stock in ECI.

Mr. Cordes exercised complete control over CFC and ECI (the corporations) during the taxable years at issue. Mr. Cordes controlled all of the corporations' operations and made all decisions pertaining to the timing, amount, and character of the distributions at issue herein. All corporate decisions that would typically be made by shareholders--including who would hold legal title to the shares of stock in the corporations, and for how long--were made by Mr. Cordes. The record owners had no knowledge of the corporations' day-to-day operations, did not authorize or disapprove of any of the distributions at issue, and, in many cases, were not aware of those distributions.

Robert Hinman, C.P.A., of Stanfield & O'Dell, P.C., prepared CFC's, ECI's, the Cordeses', John Cordes's, and Eddy Ben Cordes's tax returns for the years at issue. Michael Mayhall of Godlove, Mayhall, et al., Attorneys, prepared Jean Ann Richard's tax returns for the years at issue.

## II. Constructive Dividends

Respondent determined that one or more of the individual petitioners received constructive dividends in the years at issue from CFC and/or ECI. Specifically, respondent determined that the individual petitioners in each docket[4] received the following constructive dividends from the following corporations:

Source of Distribution

| ECI | 1994 | 1995 |
|---|---|---|
| Diversion of checks from unidentified loans | $88,225 | $16,000 |
| Diversion of tag refunds | 57,609 | 55,088 |
| Excess payoffs | 3,826 | 28,514 |
| Cash distributions to Mr. Cordes | -0- | 600,000 |
| Total from ECI | 149,660 | 699,602 |

---

[4]Respondent claims that the constructive dividends arose from certain transactions between CFC and/or ECI and the members of the Cordes family, wherein the shareholder(s) received economic benefit(s) from the corporation or corporations, without an expectation of repayment. Because respondent was initially unable to determine which individual petitioner received each constructive dividend, respondent determined, to protect the Government's interest, that each of the individual petitioners received the constructive dividend in full.

| CFC | 1994 | 1995 |
|---|---|---|
| Cash distributions to John Cordes[5] | $800,000 | -0- |
| Cash distributions to Jean Ann Richard | 800,000 | $120,000 |
| Cash distributions to Mrs. Cordes | 484,651 | 400,000 |
| Sale of 1994 and 1995 notes | 1,733,608 | 1,073,608 |
| Diversion of checks from bad debts[6] | 12,282 | -0- |
| Diversion of unbooked CFC income | 71,910 | -0- |
| Unexplained source of funds | 405,724 | 211,612 |
| Total from CFC | 4,308,175 | 1,805,220 |
| Total constructive dividends | 4,457,835 | 2,504,822 |

Below, we set out the facts relevant to respondent's determinations regarding constructive dividends.

A.   Constructive Dividends From ECI

1.   Diversion of Checks From Unidentified Loans, Diversion of Tag Refunds, and Excess Payoffs

Petitioners concede that the amounts respondent determined ECI distributed as diverted checks on unidentified loans, diverted tag refunds, and excess payoffs constitute constructive dividends to ECI's shareholder(s) for 1994 and 1995.

2.   Cash Distributions to Mr. Cordes

In 1995, ECI issued checks to Mr. Cordes in the amounts of $200,000 and $400,000.  ECI recorded the amounts of the checks in its "Paid-In Capital" account.

---

[5]The $800,000 was a check made payable to John Cordes. Although the parties stipulated that it was a cash distribution to Edmund J. Cordes, we treat it as a cash distribution of $800,000 to John Cordes, and we refer to it as such.

[6]The parties refer to these items as "Diversion of checks from Chapter 13".  The parties have failed to explain fully the significance of chapter 13, and we surmise by a careful review of the record that these checks were paid to CFC from chapter 13 trustees representing funds CFC received as a creditor to bankruptcy estates.

B.  Constructive Dividends From CFC

  1.  Cash Distributions to John Cordes

On March 16, 1994, CFC issued to John Cordes a check for $800,000.  On that same day, Mr. Cordes, or someone on his behalf, endorsed the check for $800,000 over to CFC, and CFC deposited the check in its own account.  CFC recorded this transaction as a liability in CFC's account titled "Note Payable--John J. Cordes" (John Cordes's loan account).

During 1994, CFC issued 12 checks totaling $94,000 to John Cordes.  Each was charged to John Cordes's loan account.  John Cordes returned to CFC $4,000 of the $94,000 received.[7]  During 1995, CFC issued 23 checks totaling $430,000 to John Cordes.  Each was charged to John Cordes's loan account.  Six of the 23 checks, totaling $180,000, were deposited in Mrs. Cordes's personal checking account.

John Cordes failed to report the $800,000 distribution or any of the other payments as any type of income in 1994 or 1995.  He did, however, report $20,000 of interest income from CFC in 1995.

Also on March 16, 1994, John Cordes transferred to Mr. Cordes legal title to 500 shares of stock in John Cordes, Inc.  This transaction was recorded in the "Minutes of Special Meeting of Shareholders of John Cordes, Inc.".

---

[7]The record does not disclose the circumstances regarding John Cordes's return of funds to CFC or the manner in which the transaction was reported on CFC's books.  The circumstances are not relevant in light of our holding.

## 2. Cash Distributions to Jean Ann Richard

On March 16, 1994, CFC issued to Jean Ann Richard a check for $800,000 and recorded that transaction as a debit to account No. 309, titled "Notes Payable--Edmund Cordes, Inc." This record was subsequently changed, and the transaction was recorded as a debit to CFC's asset account titled "Stock--Edmund Cordes, Inc."

On March 16, 1994, Mr. Cordes, or someone on his behalf, endorsed the check for $800,000 over to CFC, and CFC deposited the check in its own account. CFC recorded this transaction as a liability in CFC's account titled "Note Payable--Jean Ann Cordes" (Jean Ann Richard's loan account).[8]

During 1994, CFC issued 11 checks totaling $90,000 to Jean Ann Richard. Each was charged to Jean Ann Richard's loan account. During 1995, CFC issued 16 checks totaling $220,000 to Jean Ann Richard. Each was charged to Jean Ann Richard's loan account. Four of the 16 checks, totaling $100,000, were deposited in Mrs. Cordes's personal checking account.

Jean Ann Richard failed to report the $800,000 distribution or any of the other payments as any type of income in 1994 or 1995.

Also on March 16, 1994, Jean Ann Richard transferred to CFC legal title to 1,000 shares of stock in Edmund Cordes, Inc. This

---

[8]Jean Ann Cordes is the same person as Jean Ann Richard. We refer to this person as Jean Ann Richard throughout this opinion wherever appropriate.

transaction was recorded in the "Minutes of Special Meeting of Shareholders of Edmund Cordes, Inc."

### 3. Cash Distributions to Mrs. Cordes

During 1994, CFC issued 18 checks totaling $484,651 to Mrs. Cordes. During 1995, CFC issued five checks totaling $120,000 to Mrs. Cordes. Those checks were deposited into Mrs. Cordes's personal checking account in the year in which they were issued. Additionally, the six checks totaling $180,000 charged to John Cordes's loan account and the four checks totaling $100,000 charged to Jean Ann Richard's loan account were also deposited in Mrs. Cordes's personal checking account in 1995.

In each of 1994 and 1995, one of the checks issued to Mrs. Cordes was in the amount of $20,000, and each year CFC deducted those $20,000 payments as interest expenses, and Mrs. Cordes reported the payments as interest income. The remainder of the checks issued to Mrs. Cordes were charged to account No. 312, a shareholder loan account in the Cordeses' name.

### 4. Bargain Sale of Notes

In the years at issue, CFC was in the trade or business of financing auto purchases. Each note CFC issued to a purchaser was recorded on a ledger card and, eventually, in a computer. As CFC received each payment on a note, CFC recorded that payment on the ledger card and issued a receipt to the borrower.

During 1994, Mr. Cordes used $200,000 of his own money to "pay off" a number of CFC's outstanding notes. Mr. Cordes and CFC applied that $200,000 to the selected notes in a manner

directly related to those notes' outstanding balances. CFC then treated each of those notes as satisfied on its books and erased records of those notes from its computer. CFC also removed the ledger cards from its records, and Mr. Cordes added those records, or had them added, to his own filing system. Thereafter all of the borrowers' payments on the "paid off" notes were paid or delivered ultimately to Mr. Cordes. Mr. Cordes issued receipts to the borrowers.[9]

Mr. Cordes accumulated the payments he received on those notes and used them to "pay off" a number of CFC's remaining outstanding notes. Throughout 1994 and 1995, Mr. Cordes "paid off" 1,168 of CFC's notes in this fashion, 584 in each year (the 1994 notes and the 1995 notes, respectively).

At the time the 1994 notes were removed from CFC's books, they were worth $3,340,313. In exchange for those 1994 notes, Mr. Cordes paid CFC $1,600,700, and CFC deducted the balance, $1,733,608, as a bad debt for 1994. Respondent determined the difference between the 1994 notes' values and the prices Mr. Cordes paid for them constituted a constructive dividend to CFC's shareholder(s).[10]

---

[9]Some CFC employees assisted Mr. Cordes in collecting the payments and issuing the receipts. In many cases, the borrowers were not aware that Mr. Cordes now held those notes.

[10]The parties stipulated that the difference between the value of the 1994 notes and the amount Mr. Cordes transferred in exchange for the 1994 notes was $1,733,608. The difference between the 1994 notes' values and the prices Mr. Cordes paid for them, however, is $1,739,614, according to the values the parties

(continued...)

At the time the 1995 notes were removed from CFC's books, they were worth $5,218,828. In exchange for those 1995 notes, Mr. Cordes paid CFC $4,139,512, and CFC deducted the balance, $1,073,608,[11] as a bad debt for 1995. Respondent determined the difference between the 1995 notes' values and the prices Mr. Cordes paid for them constituted a constructive dividend to CFC's shareholder(s).

In 1997, CFC executed a Form CG-4549, Income Tax Examination Changes, in which it conceded that the bad debt deductions it claimed in 1994 and 1995 with respect to the 1994 and 1995 notes described above were false, fraudulent, and not allowable.

The parties stipulated that the 1994 notes and the 1995 notes accumulated $138,409 and $448,164, respectively, in interest from the dates Mr. Cordes "paid them off". Neither CFC nor Mr. Cordes reported that interest income on their returns for those years. The Cordeses did not provide their accountant, Mr.

_____

[10](...continued)
assigned to those items. We are unable to discover the source or rationale for this discrepancy, but we nevertheless treat $1,733,608 as the amount at issue, in accordance with respondent's determination and the parties' stipulation.

[11]The parties stipulated that the difference between the value of the 1995 notes and the amount Mr. Cordes transferred in exchange for the 1995 notes was $1,073,608. The difference between the 1995 notes' values and the prices Mr. Cordes paid for them, however, is $1,079,317, according to the values the parties assigned to those items. We are unable to discover the source or rationale for this discrepancy, but we nevertheless treat $1,073,608 as the amount at issue, in accordance with respondent's determination and the parties' stipulation.

Hinman, with complete and accurate information regarding the 1994 and 1995 notes.

In connection with the 1994 and 1995 notes, CFC paid costs associated with repossessions of financed vehicles in the amounts of $6,879 and $16,175 in 1994 and 1995, respectively. CFC deducted these payments on its 1994 and 1995 Forms 1120, U.S. Corporation Income Tax Return, respectively.

5.    Diversion of Checks From Bad Debt Recoveries, Diversion of Unbooked CFC Income, and Unexplained Source of Funds

The parties stipulated that the amounts respondent determined CFC distributed as diverted checks from bad debt recoveries and as diverted unbooked CFC income constitute constructive dividends for 1994 to the extent of $10,380 and $71,910, respectively. Respondent concedes that portion of his determination in excess of the parties' stipulation.

As set forth above, respondent determined that CFC sold the 1994 and 1995 notes to Mr. Cordes for prices below their fair market value. Respondent determined that the prices at which they were sold were $1,600,700 and $4,139,512, respectively, but was unable to determine the source of all those funds used to purchase the notes at those prices. Respondent determined that the unexplained source of funds constituted a further constructive dividend to CFC's shareholder(s). After stipulations, the parties agree that, with respect to these items, CFC's shareholder(s) received constructive dividends in the amount of $45,702, both in 1994 and in 1995. Respondent

concedes that portion of his determination in excess of the parties' stipulation.

OPINION

I.   Constructive Dividends

Respondent determined that each of the individual petitioners before us had taxable income from receipt of constructive dividends in 1994 and 1995 in amounts of $4,457,835 and $2,504,822, respectively.  See sec. 61(a)(7).  Respondent primarily argues that Mr. Cordes is properly taxable for all of the constructive dividends, rather than any of the other individual shareholders, because respondent contends Mr. Cordes was the beneficial owner of all the CFC and ECI stock during the years at issue.[12]  Respondent alternatively argues that each individual petitioner is taxable on receipt of constructive dividends in amounts proportionate to his or her record ownership.

Petitioners argue that although Mr. Cordes completely controlled CFC and ECI, Mr. Cordes cannot be held to have received constructive dividends because he did not hold stock in those corporations in the taxable years before us.  In response to respondent's alternative argument, petitioners argue that because Mr. Cordes completely controlled CFC and ECI, and the record owners had no knowledge of, did not authorize, or did not

_____

[12]Respondent concedes that if we find Mr. Cordes was the beneficial owner of all the CFC and ECI stock during the years at issue, then the other individual petitioners are not liable for tax on receipt of constructive dividends for those years.

actually benefit from the transactions, they received no constructive dividends.  This is not the first time Mr. Cordes and his family have appeared before us, nor is it the first time that Mr. Cordes and his family have presented us with a mishmash of arguments apparently designed to escape the consequences of the tax laws.  Cordes v. Commissioner, T.C. Memo. 2002-124; Cordes v. Commissioner, T.C. Memo. 1994-377.  For the reasons discussed below, we conclude that, in the taxable years before us, CFC and ECI conferred certain economic benefits on Mr. Cordes as beneficial owner of all the stock in those corporations, without expectation of repayment, and that Mr. Cordes has income from constructive dividends.

The law in this area is well settled.  Section 301(a) and (c)(1) requires the inclusion in a shareholder's gross income of amounts received as dividends.  Secs. 61(a)(7), 301(c)(1), 316(a); Hillsboro Natl. Bank v. Commissioner, 460 U.S. 370, 392 (1983); see Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); see also Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729-731 (1929).  Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders--(1) out of its earnings and profits accumulated after February 28, 1913, or (2) out of its earnings and profits of the taxable year".[13]  It is not necessary that the corporation

_____

[13]Petitioners have failed to prove that there was not sufficient accumulated or current earnings and profits to support the deficiency determined in respondent's notices of deficiency.
(continued...)

intend a dividend, or that the distribution be termed a dividend or recorded as such. Dolese v. United States, 605 F.2d 1146, 1152 (10th Cir. 1979). Thus, dividends may be either formally declared, or they may be "constructive". Ireland v. United States, supra at 735.

A constructive dividend is paid when a corporation confers an economic benefit on a shareholder without expectation of repayment. Wortham Mach. Co. v. United States, 521 F.2d 160, 164 (10th Cir. 1975). That shareholder, for the taxable years before us, is Mr. Cordes.

Although Mrs. Cordes, Eddy Ben Cordes, Jean Ann Richard, and John Cordes, in some proportion, held legal title to all of the outstanding shares of stock in CFC and ECI throughout the taxable years at issue, "record ownership of stock, standing alone, is not determinative of who is required to include any dividends attributable to such stock in gross income. Rather, beneficial ownership is the controlling factor." Cordes v. Commissioner, T.C. Memo. 1994-377 (citing Walker v. Commissioner, 544 F.2d 419

---

[13](...continued)
Rule 142(a). The Internal Revenue Service Restructuring & Reform Act of 1998, Pub. L. 105-206, sec. 3001, 112 Stat. 685, 726, added sec. 7491(a), which is applicable to court proceedings arising in connection with examinations commencing after July 22, 1998. Under sec. 7491, Congress requires the burden of proof to be placed on the Commissioner, subject to certain limitations, where a taxpayer introduces credible evidence with respect to factual issues relevant to ascertaining the taxpayer's liability for tax. In the instant case, petitioners have not raised the application of this provision. Further, the record does not indicate that the Commissioner's examinations commenced after July 22, 1998.

(9th Cir. 1976), revg. T.C. Memo. 1972-223; Ragghianti v. Commissioner, 71 T.C. 346, 349 (1978), affd. without published opinion 652 F.2d 65 (9th Cir. 1981); Cepeda v. Commissioner, T.C. Memo. 1994-62). "'Beneficial ownership is marked by command over property or enjoyment of its economic benefits.'" Cordes v. Commissioner, T.C. Memo. 1994-377 (quoting Cepeda v. Commissioner, supra). A taxpayer's total control over a corporation and use of corporate funds for personal reasons can result in constructive dividends, even though the taxpayer did not hold legal title to the corporation's stock at the time of the advances. Yelencsics v. Commissioner, 74 T.C. 1513, 1532-1533 (1980); Cordes v. Commissioner, T.C. Memo. 1994-377.

In Cordes v. Commissioner, T.C. Memo. 1994-377, and in Cordes v. Commissioner, T.C. Memo. 2002-124, we held Mr. Cordes received constructive dividends even though he did not hold legal title to any shares because we found he exercised full control over CFC in the taxable years there at issue. In those cases, Mr. Cordes caused CFC to make distributions to him, to friends and family, and to his personal creditors; he controlled the timing, amount, and uses of those funds. Because Mr. Cordes had total control over CFC and used the corporate funds for personal reasons, we held that "whether or not petitioner [Mr. Cordes] was a stockholder of record, petitioner had beneficial ownership of all of the stock". Cordes v. Commissioner, T.C. Memo. 2002-124; Cordes v. Commissioner, T.C. Memo. 1994-377. By virtue of his

beneficial ownership, we held he received constructive dividends and was required to include those dividends in his gross income.

Petitioners do not dispute Mr. Cordes's complete control over all aspects of the corporations in the taxable years before us; in fact, petitioners rely on that control as the reason why the record owners should not be held to have received constructive dividends. Petitioners acknowledge that in the taxable years before us, Mr. Cordes exercised complete control over CFC and ECI and made all the decisions as to amounts, timing, and character of the distributions here at issue. All decisions typically made by shareholders were instead made by Mr. Cordes, and the record owners knew that. The parties concede that, regardless of record ownership, Mr. Cordes had the power to change ownership of those shares as he wished. Petitioners even stated in their opening brief that "The nominal owners are Eddy Ben Cordes, John J. Cordes, and Jean Ann Richard for the years 1994 and 1995. It is clear however that these persons own [these corporations] in form only. The true control of [these corporations] is in Edmund J. Cordes."

It is abundantly clear that Mr. Cordes was CFC's and ECI's beneficial owner during the taxable years before us. We must now consider whether ECI and CFC conferred economic benefits on the petitioner-shareholder, Mr. Cordes, as beneficial owner, without expectation of repayment. See Dolese v. United States, supra at 1152 (citing Palo Alto Town & Country Vill., Inc. v.

<u>Commissioner</u>, 565 F.2d 1388 (9th Cir. 1977), affg. T.C. Memo. 1973-223).

In order for a company-provided benefit to be treated as income to the shareholder, the item "must primarily benefit taxpayer's personal interests as opposed to the business interests of the corporation." <u>Ireland v. United States</u>, <u>supra</u> at 735; accord <u>Dolese v. United States</u>, <u>supra</u> at 1152. Petitioners bear the burden of proving that the amounts at issue were not expended for personal benefit or in discharge of personal obligations. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111 (1933); <u>Challenge Manufacturing Co. v. Commissioner</u>, 37 T.C. 650 (1962); <u>Arnold v. Commissioner</u>, T.C. Memo. 1994-97. Our standard, in reviewing these many expenditures, is whether the expense primarily benefited ECI or CFC, as appropriate, or their sole shareholder, Mr. Cordes. <u>Frazier v. Commissioner</u>, T.C. Memo. 1994-358, affd. 90 F.3d 437 (10th Cir. 1996).

A.  <u>Constructive Dividends From Eddie Cordes, Inc.</u>

1.  <u>Diversion of Checks From Unidentified Loans, Diversion of Tag Refunds, and Excess Payoffs</u>

Petitioners concede these items constitute constructive dividends for 1994 and 1995. Petitioners' only contention is that Mr. Cordes did not receive income from these items because he was not a shareholder in ECI. We have already held that Mr. Cordes was ECI's sole shareholder for Federal income tax purposes, and we now hold that petitioners' concession operates to include these items in Mr. Cordes's income.

2. <u>Cash Distributions to Mr. Cordes</u>

ECI distributed $600,000 to Mr. Cordes in 1995. Petitioners contend that this amount does not represent constructive dividends, but instead it represents loans or repayments of loans by ECI to Mr. Cordes. Petitioners have offered no evidence that any loans existed between ECI and Mr. Cordes. Without support, petitioners assert that the "multi-year history of large loans by and to Mr. Cordes and these corporations over the years" and the "consistent history of repayment of the loans" supports their position. These statements are insufficient to show that the economic nature of the transactions themselves is that of a debt rather than of a constructive dividend. <u>Cordes v. Commissioner</u>, T.C. Memo. 1994-377 (citing <u>Williams v. Commissioner</u>, 627 F.2d 1032, 1034 (10th Cir. 1980), affg. T.C. Memo. 1978-306; <u>Alterman Foods, Inc. v. United States</u>, 505 F.2d 873, 876-877 (5th Cir. 1974)).

We cannot find that these payments represent loans or repayments of loans; petitioners have failed to meet their burden of proof. Furthermore, because petitioners have not shown that Mr. Cordes did not benefit or that ECI did benefit from these payments, we conclude these payments are constructive dividends to ECI's beneficial owner and sole shareholder for Federal income tax purposes, Mr. Cordes.

B. Constructive Dividends From CFC

    1.    Cash Distributions to John Cordes and Jean Ann Richard

On March 16, 1994, CFC made two checks payable, one to John Cordes, the other to Jean Ann Richard, each in the amount of $800,000. Both checks bore the notation "Purchase Stock", and both checks were endorsed by Mr. Cordes, or someone acting on his behalf, and redeposited in CFC's bank account at Mr. Cordes's direction. Upon receipt of the checks, CFC established accounts on its books evidencing a note payable to John Cordes and another to Jean Ann Richard, each in the amount of $800,000. Throughout 1994 and 1995, CFC made a number of distributions to John Cordes, Jean Ann Richard, and Mrs. Cordes and charged those distributions to John Cordes's and Jean Ann Richard's loan accounts.

    a.    The Two $800,000 Distributions

Respondent's primary arguments with respect to the two $800,000 distributions are: (1) CFC distributed $800,000 for Mr. Cordes's use in purchasing stock from John Cordes, and the distribution thereby constitutes a constructive dividend to CFC's shareholder(s),[14] and (2) CFC distributed $800,000 to Jean Ann

---

[14]Respondent also argued that John Cordes received the $800,000 as proceeds from the sale of a capital asset, but respondent did not amend his answer to include the tax on such proceeds. Respondent further argued that John Cordes lent the $800,000 to CFC upon his receipt of the funds and that CFC made payments to John Cordes on that loan in 1994 and 1995. As these arguments have no bearing on whether the items in the notice of deficiency constitute constructive dividends to CFC's shareholder(s), we do not examine these arguments.

Richard,[15] and the distribution thereby constitutes a constructive dividend to CFC's shareholder(s).[16]

Petitioners contend that John Cordes and Jean Ann Richard never received the two $800,000 checks or the funds the checks represented, and CFC's shareholder(s) therefore cannot be held to have received constructive dividends. Petitioners argue that the two $800,000 checks were drafted merely to establish interest-free lines of credit through CFC to John Cordes and Jean Ann Richard and that only amounts charged to those lines of credit and actually received by John Cordes or Jean Ann Richard may be constructive dividends.

Petitioners' argument that CFC did not confer a benefit on John Cordes and Jean Ann Richard begs the question of who was the beneficial owner of the stock nominally owned by John Cordes and

---

[15]Regarding the distribution to Jean Ann Richard, respondent asserts that the distribution alternatively may be characterized as a sale of stock in Edmund Cordes, Inc., by Jean Ann Richard to CFC in exchange for (a) $800,000, which she constructively received in 1994, or (b) $800,000 paid by installment, of which she received $90,000 in 1994 and $120,000 in 1995.

[16]Upon careful review of the facts in this case and our prior opinions involving Mr. Cordes and the Cordes corporations, we find that Mr. Cordes was beneficial owner of all the corporations discussed herein, including those corporations in which respondent contends Mr. Cordes purchased stock. The facts do not establish that Mr. Cordes used a $800,000 check to purchase stock from John Cordes, or that CFC used $800,000 to purchase stock from Jean Ann Richard. The facts do show that, on March 16, 1994, Mr. Cordes and CFC became the respective record owners of the shares in question, but Mr. Cordes's complete control over the corporations allowed him to alter record ownership in any or all of the corporations at any time, without consideration.

Jean Ann Richard. CFC conferred economic benefits on its shareholder, Mr. Cordes, by and upon delivering to him the two $800,000 checks, on March 16, 1994, without expectation of repayment. CFC provided these funds to Mr. Cordes for personal reasons, and it is inconsequential that Mr. Cordes subsequently deposited the funds into CFC's bank account for his family's benefit, rather than directly into his children's personal accounts. What Mr. Cordes ultimately did with the funds is not relevant; CFC conferred upon Mr. Cordes the economic benefit of control over $1,600,000 for personal reasons. Because CFC conferred upon Mr. Cordes the ability to dispose of $1,600,000 for any personal reason and received no corporate benefit and did not expect any repayment, we hold that Mr. Cordes received constructive dividends in 1994 in the aggregate amount of $1,600,000.

b. Subsequent Distributions From John Cordes's and Jean Ann Richard's Loan Accounts

In 1994, distributions were made from John Cordes's loan account to John Cordes in the amount of $94,000 and from Jean Ann Richard's loan account to Jean Ann Richard in the amount of $90,000. In 1995, payments were made from John Cordes's loan account to John Cordes in the amount of $250,000 and to Mrs. Cordes in the amount of $180,000 and from Jean Ann Richard's loan account to Jean Ann Richard in the amount of $120,000 and to Mrs. Cordes in the amount of $100,000. Respondent determined that the distributions to Mrs. Cordes in 1994 and 1995 and the

distributions to Jean Ann Richard in 1995 constitute constructive dividends to CFC's shareholder(s). For some reason, respondent did not make a similar determination with respect to the distributions to John Cordes in 1994 and 1995 or with respect to the distributions to Jean Ann Richard in 1994.[17]

Respondent's positions are inconsistent, and respondent's arguments are confusing, incomplete, and unsupported, at best. In light of our holding, we see no need to address them fully. The distributions to John Cordes, Jean Ann Richard, and Mrs. Cordes were charged to John Cordes's and Jean Ann Richard's loan accounts. Those loan accounts were established to account for the $1,600,000 that was distributed in effect to Mr. Cordes and returned to CFC until Mr. Cordes determined what to do with the funds. The loan accounts operated in substance as savings accounts from which Mr. Cordes distributed funds to his family members at will. Because we have already held that Mr. Cordes must report the $1,600,000 recorded in the loan accounts as constructive dividends, we hold that the distributions from the loan accounts; i.e., the distributions of $94,000 and $250,000 to

---

[17]Respondent instead argued that the distributions to John Cordes establish that a bona fide debt existed between CFC and John Cordes, but respondent did not determine that a portion of those distributions constituted interest income or, if respondent agreed with petitioners that these distributions were interest-free loans from CFC to John Cordes, that the forgone interest constituted a constructive dividend to CFC's shareholder(s). Respondent has not made an argument with regard to the distributions to Jean Ann Richard totaling $90,000, other than to mention that they may constitute constructive dividends or the proceeds of an installment sale to Jean Ann Richard.

John Cordes in 1994 and 1995, respectively; the distributions of $90,000 and $120,000 to Jean Ann Richard in 1994 and 1995, respectively; and the distributions of $180,000 and $100,000 to Mrs. Cordes in 1995 from John Cordes's and Jean Ann Richard's accounts, respectively, do not constitute additional constructive dividends from CFC to Mr. Cordes.[18]

####     2.    Cash Distributions to Mrs. Cordes

CFC issued checks totaling $484,651 in 1994 and totaling $120,000 in 1995 made payable to Mrs. Cordes.  All of the checks were deposited in Mrs. Cordes's personal checking account. Respondent determined that all of these distributions constituted constructive dividends to CFC's shareholder(s).  Petitioners maintain that the distributions are not constructive dividends to CFC's shareholder(s) because the shareholder(s) did not authorize, receive, or derive economic benefits from the distributions or, alternatively, that the distributions represented loans or the repayment of loans to the shareholder(s).

Respondent also determined that the $180,000 and $100,000 distributions Mrs. Cordes received and deposited in 1995 and which were charged to John Cordes's and Jean Ann Richard's loan accounts, respectively, were constructive dividends to CFC's shareholder(s).  We addressed those distributions above.  Below,

---

[18]Respondent has not alleged that these distributions are taxable to any of the petitioners on any other grounds nor has respondent alleged that the distributions are gifts from Mr. Cordes to the respective recipients.

we address the $484,651 and the $120,000 Mrs. Cordes received in 1994 and 1995, respectively, and which have not already been considered.

### a. Interest

In each of 1994 and 1995, CFC deducted $20,000 of the distributed funds as interest expenses, and Mrs. Cordes included that $20,000 in income as interest received. Respondent determined that CFC and Mrs. Cordes improperly treated the funds as interest because CFC was not indebted to Mrs. Cordes in 1994 or 1995. Respondent therefore disallowed CFC's deductions and decreased Mrs. Cordes's income.

Petitioners contend "The uncontroverted testimony here is that $200,000.00 was advanced to Cordes Finance Corp. by Edmund J. Cordes in 1994 * * *. * * * the money was advanced and the $20,000.00 payments annually do constitute a reasonable rate of interest (approximately 10%) on these funds." Petitioners have confused the facts. We have found the $200,000 was transferred by Mr. Cordes to CFC in exchange for some of the notes. Mrs. Cordes did not transfer those funds, nor did the transfer of $200,000 constitute a loan. Petitioners have failed to demonstrate that CFC was indebted in any way to Mrs. Cordes,[19]

---

[19]We note that although Mr. Cordes testified that CFC repaid total loans of approximately $884,000 to Mrs. Cordes's account between 1994 and 1995, petitioners have not presented any corroborative evidence that such loans existed.

Mr. Cordes also testified that some of the funds Mrs. Cordes received in 1995 may have been repayments of loans she made to John Cordes. Mr. Cordes's testimony is inconsistent and not

(continued...)

and we must therefore hold that the two $20,000 distributions to Mrs. Cordes do not constitute deductible interest expenses to CFC or interest income to Mrs. Cordes.

### b.   Loans and Repayment of Loans

Respondent determined that the amounts Mrs. Cordes received and deposited which we have not yet addressed, $464,651 in 1994 and $100,000 in 1995, constitute constructive dividends to CFC's shareholder(s).  Petitioners posit a theory that these distributions are either loans from CFC to Mrs. Cordes or repayment of loans by CFC to Mrs. Cordes.  Petitioners rely on their alleged history of loans, together with CFC's treatment of these distributions; petitioners did not introduce any evidence that these distributions were loan related.

Petitioners failed to show that CFC benefited from these distributions or that Mr. Cordes did not so benefit. Distributions to family members can constitute constructive dividends to the shareholder(s) when the distributions fail to benefit the corporation.  Cordes v. Commissioner, T.C. Memo. 1994-377 (in situation nearly identical to that before us, this Court held CFC's transfers to friends, wife, and children of Mr. Cordes to be constructive dividends to him when he failed to show corporate benefit or expectation of repayment); Proctor v. Commissioner, T.C. Memo. 1981-436 (payments to shareholder's mother, in excess of compensation reasonable for services

---

[19](...continued)
credible.

provided, constituted constructive dividend income to shareholder). Because petitioners failed to show Mr. Cordes received no personal benefit from these transfers, we hold Mr. Cordes received constructive dividends in 1994 and 1995 with respect to these items.

### 3. Bargain Sale of Notes

Respondent determined that CFC sold 584 notes to Mr. Cordes in each of 1994 and 1995 at prices below their fair market value and that the discount at which CFC sold the notes constitutes constructive dividends from CFC to CFC's shareholder(s). Petitioners contend CFC owned the 1994 and 1995 notes at all times and that because Mr. Cordes did not purchase the 1994 and 1995 notes (in a bargain sale or otherwise), CFC conferred no economic benefit on its shareholder(s). We conclude below that Mr. Cordes did in fact purchase the 1994 and 1995 notes at prices below fair market value and that Mr. Cordes, as beneficial owner of CFC, received constructive dividends in amounts equal to the discounts received.

In 1994, Mr. Cordes transferred $200,000 of his personal savings to CFC. Contemporaneously, CFC removed a number of notes from its books, and Mr. Cordes recorded those notes on his books. Mr. Cordes contends that his transfer of $200,000 to CFC was merely coincident with CFC's reorganization of its records. Mr. Cordes, however, offered no evidence that the $200,000 was treated as a capital contribution or loan to CFC, rather than as funds used to purchase the notes.

Mr. Cordes later collected payments of principal and interest on those notes and transferred those payments to CFC in exchange for additional notes. Petitioners have failed to offer any evidence that those subsequent transfers to CFC were other than funds used to purchase notes. Petitioners contend instead that CFC owned the notes because the borrowers were never told to make payments to Mr. Cordes, the ledger cards were merely moved across the room, payments were still made payable to CFC, and those payments were ultimately deposited in CFC's account.

We reject petitioners' contentions for several reasons. The borrowers' beliefs regarding the identity of the lender, and the retention of the ledger cards in the same room, are of comparatively little relevance in these circumstances. What is more relevant is that CFC treated the notes as satisfied and completely removed the records from its computer and files, going so far as to claim deductions for bad debts, and Mr. Cordes added the records to his files and treated them as outstanding debts owed to him. Moreover, any payments delivered to CFC were promptly forwarded to Mr. Cordes. Although CFC's employees occasionally collected the payments from the borrowers, recorded them in Mr. Cordes's records, and issued receipts for those payments, they did so on behalf of Mr. Cordes.

We also reject petitioners' allegation that Mr. Cordes merely held the payments "in escrow", ultimately delivering them to CFC. We presume petitioners' argument is that because Mr. Cordes never deposited the payments in his own account, he did

not have dominion or control over the funds, and the funds, therefore, are not income to him. However, Mr. Cordes received payments on notes he had already purchased from CFC and exchanged them for more of CFC's notes, which he then also owned. That Mr. Cordes did not first deposit the payments received in a personal account before purchasing additional notes is irrelevant. We find that Mr. Cordes had full control over the payments and that he owned the notes in question.

Clearly, Mr. Cordes purchased 1,168 notes from CFC in 1994 and 1995. Petitioners have disputed only who owned the 1994 and 1995 notes and have not addressed whether CFC sold the notes to Mr. Cordes for prices below fair market value, should we conclude, as we have, that Mr. Cordes owned the notes. Section 1.301-1(j), Income Tax Regs., states that "If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies." Because CFC sold the 1994 and 1995 notes to Mr. Cordes for prices below fair market value, we hold that the differences between the prices paid for the notes and the fair market values of the notes are constructive dividends to Mr. Cordes. See Estate of Durkin v. Commissioner, 99 T.C. 561, 567 (1992); Eugene D. Lanier, Inc. v. Commissioner, T.C. Memo. 1998-7 (citing sec. 1.301-1(j), Income Tax Regs.; Palmer v. Commissioner, 302 U.S. 63, 69-70 (1937)).

4.   Diversion of Checks From Bad Debt Recoveries and
     Diversion of Unbooked CFC Income

The parties agree that these items constitute constructive dividends for 1994, in the amounts of $10,380 and $71,910, respectively.  Petitioners' only contention is that Mr. Cordes did not receive income from these items because he was not a shareholder in CFC.  We have already held that Mr. Cordes was CFC's sole shareholder for Federal income tax purposes, and we now hold that petitioners' concessions operate to include these items in Mr. Cordes's income.

5.   Unexplained Source of Funds

In connection with respondent's determination that Mr. Cordes purchased the 1994 and 1995 notes at prices below fair market value, respondent further determined that CFC provided some of the funds for those purchases or further discounted the purchases.  That is, although the parties stipulated that CFC sold the 1994 notes to Mr. Cordes for $1,600,700, only $1,248,907 could be traced to funds supplied by Mr. Cordes.  Respondent determined that the difference, $351,793, was a further constructive dividend from CFC to its shareholder(s).  Likewise, the parties stipulated that CFC sold the 1995 notes to Mr. Cordes for $4,139,512 but that only $3,963,462 could be traced to funds supplied by Mr. Cordes.  Respondent determined that the difference, $176,050, was a further constructive dividend from CFC to its shareholder(s).  The parties later stipulated that of those amounts, only $45,702 constitutes a constructive dividend

for each of 1994 and 1995, and respondent concedes that the amounts in excess of those stipulations are not constructive dividends.

The only issue with regard to these items is who received these constructive dividends. Because Mr. Cordes was CFC's sole shareholder for Federal income tax purposes, we hold Mr. Cordes must include constructive dividends of $45,702 in income for each of his 1994 and 1995 taxable years.

## II. The Proper Tax Treatment of Interest Earned on the 1994 and 1995 Notes

In our discussion above regarding the 1994 and 1995 notes, we found that Mr. Cordes purchased 584 notes from CFC in each of 1994 and 1995. Respondent determined that Mr. Cordes earned interest on the notes purchased[20] and that Mr. Cordes earned that interest in connection with his trade or business (presumably the trade or business of financing, but respondent has not specifically named that trade or business) and is liable for tax on the net earnings from self-employment. The parties stipulated that interest in the amounts of $138,409 and $448,164 was earned on the notes in 1994 and 1995, respectively.

Petitioners concede that neither CFC nor Mr. Cordes reported any of that interest as income and that the owner of the notes, either CFC or Mr. Cordes, must report that income. Petitioners

---

[20]Respondent alternatively determined that if we find Mr. Cordes did not purchase the notes; i.e., that CFC still owned the notes, then CFC must report that interest as income in 1994 and 1995.

contend CFC owned the notes at all times, and CFC concedes the interest is includable in its income. Because we have held that Mr. Cordes owned the 1994 and 1995 notes, Mr. Cordes must include in income the interest on those notes, in accordance with his concessions and section 61(a)(4).

Mr. Cordes has not addressed respondent's contention that if Mr. Cordes owned the notes, he is liable for self-employment tax on the interest.[21] By virtue of his failure to address the self-employment tax issue, Mr. Cordes is liable for self-employment tax on that income. See also sec. 1.1402(a)-5(b), Income Tax Regs., for specific inclusion.

III. Repossession Costs Deduction

CFC deducted costs incurred and paid in connection with repossessing certain vehicles in 1994 and 1995, including the costs associated with repossessing vehicles which secured the 1994 and 1995 notes. The parties stipulated that CFC incurred, paid, and deducted costs of $6,879 in 1994 and $16,175 in 1995 in

---

[21]The extent of Mr. Cordes's argument regarding self-employment tax is as follows:

XI. EDMUND J. CORDES IS NOT LIABLE FOR SELF-EMPLOYMENT TAX FOR THE TAXABLE YEARS 1994 AND 1995.

Petitioner contends the omitted interest income relating to the discounted notes is income to Cordes Finance Corp., not to Petitioner. Any other income as a result of constructive dividends would not be subject to self employment taxes.

IRC §1401(a) imposes a tax only on the self employment income of an individual and Edmund J. Cordes had no self employment income in 1994 or 1995.

connection with repossessing vehicles that secured the 1994 and 1995 notes. Respondent determined that CFC improperly deducted the costs under section 162 because CFC did not incur or pay the costs in connection with its trade or business. Petitioners contend that CFC owned the notes and that CFC paid and properly deducted the costs in connection with its trade or business.

Section 162(a) provides for a deduction from income of all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 1.162-1(a), Income Tax Regs., provides that the expenses deductible from income include those pertaining to the taxpayer's trade or business. In the instant cases, we have held Mr. Cordes, not CFC, owned the notes associated with these costs. It follows that CFC did not incur or pay these costs in connection with its own trade or business, but in connection with an activity carried on by Mr. Cordes. Petitioners have cited no authority allowing one party (CFC) a deduction for costs paid in connection with another party's (Mr. Cordes's) trade or business, or other activity. We hold, therefore, CFC may not deduct those costs under section 162.[22]

--------

[22]Petitioner contends that if CFC may not deduct the costs, then we must allow Mr. Cordes to deduct them. This issue was not formally raised by either party, but both parties have addressed it, and we treat it as tried by consent.

Because Mr. Cordes is a cash method taxpayer, he can deduct the costs in the year in which he pays them. Sec. 461(a); United States v. Hughes Props., Inc., 476 U.S. 593, 599 (1986). Because Mr. Cordes did not pay the costs in 1994 or 1995, he may not deduct the costs in those taxable years.

IV.  Accuracy-Related Penalties

Respondent determined that each petitioner is liable for an accuracy-related penalty for each of the taxable years before us.[23]  With respect to ECI, docket No. 19027-98, 1994 is the only year in which the penalty is still at issue.  We consider the 1994 and 1995 taxable years with respect to all the other petitioners.

A.   ECI, the Cordeses' Children, CFC, and the Accuracy-Related Penalty Due to a Substantial Understatement of Income Tax

Respondent determined that all petitioners, save the Cordeses, are liable for the accuracy-related penalty due to a substantial understatement of income tax pursuant to sec. 6662(a) and (b)(2).  A substantial understatement is an understatement of income tax for any taxable year which exceeds the greater of (a) 10 percent of the tax required to be shown on the return, or (b) $5,000, in the case of an individual, or $10,000, in the case of a corporation.  Sec. 6662(d)(1).  As this threshold computation is dependent on our other, earlier, conclusions, we leave for the Rule 155 computation whether there was a substantial understatement and whether and to what extent an accuracy-related

---

[23]In docket No. 5508-99, respondent did not determine petitioner Eddie Cordes, Inc., Successor by Merger with Cordes Finance Corp., was liable for the accuracy-related penalty pursuant to sec. 6662(a) for 1994.  Respondent so determined because the items which were not attributable to fraud did not give rise, on their own, to a deficiency to which an accuracy-related penalty could attach.  Respondent did determine, however, that should we find petitioner not liable for the fraud penalty pursuant to sec. 6663, petitioner is liable for the accuracy-related penalty pursuant to sec. 6662(a).

penalty is properly imposed for each of the taxable years at issue in these dockets.

Petitioners contend that they are not liable for the substantial understatement penalty because they did not substantially understate their income tax liabilities.  ECI separately alleges that "the under<u>payment</u> of tax after all agreed adjustments is less than $10,000."  (Emphasis added.)  Rather than point out all of petitioner's errors in making this statement, we defer to the Rule 155 computation for resolution of ECI's liability.

The Cordes children[24] and CFC claim that (1) they did not understate their income tax and, alternatively, (2) they relied on their financial adviser/return preparer for correct and proper tax return preparation and that such reliance absolves them of liability for the penalty.  As to their first argument, to the extent the Rule 155 computation discloses a substantial understatement as defined in section 6662(d)(1), petitioners' primary argument fails.  If the Rule 155 computation discloses no substantial understatement, then no accuracy-related penalty is proper as to that petitioner for that taxable year.

---

[24]We have found that the Cordes children did not receive constructive dividends, and it appears that the Rule 155 computation will demonstrate that they did not substantially understate their respective income tax liabilities.  We nevertheless address the accuracy-related penalties as they relate to these petitioners, in the unlikely event that the Rule 155 computation does demonstrate a substantial understatement.

As to petitioners' second argument, section 6664(c)(1) provides a defense against the accuracy-related penalty with respect to any portion of an underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Reliance on professionals may satisfy the reasonable cause and good faith elements of section 6664(c)(1) if taxpayers show by a preponderance of the evidence that the professional was a competent professional who had sufficient expertise to justify reliance, the taxpayer gave the adviser all necessary and accurate information, and the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 99 (2000).

Based on all the pertinent facts and circumstances, section 1.6664-4(b)(1), Income Tax Regs., we find petitioners have failed to establish that there was reasonable cause for any portion of the understatements in these cases or that they acted with any measure of good faith. Sec. 6664(c)(1). Among other reasons, John Cordes, Eddy Ben Cordes, and CFC have not established that they provided Robert Hinman, their financial adviser/return preparer, with all the necessary and accurate information or that Mr. Hinman advised them on any reporting positions. Petitioners seemed to rely on Mr. Hinman, if at all, solely because he was a certified public accountant known and recommended by Mr. Cordes. John Cordes testified that "I don't really recall what specifically was on * * * [the 1995 tax return], what Robert

[Hinman] sent me. I--my wife and I signed and returned it. He's a CPA and I figured he knew how to handle that situation", referring to $20,000 reported on his 1995 return as interest, for which he could not recollect the source.

Jean Ann Richard has also failed to prove she reasonably relied on her return preparer. Jean Ann Richard's returns for 1994 and 1995 were not prepared by Mr. Hinman. The record contains no information regarding Mr. Mayhall (the individual who prepared her returns), Mr. Mayhall's competency or expertise, what information Jean Ann Richard provided to him, or whether he issued any advice upon which Jean Ann Richard relied.

We hold petitioners are liable for the accuracy-related penalty due to substantial understatement of income tax pursuant to section 6662(a) and (b)(2), to the extent the Rule 155 computation shows an underpayment of tax.

B.  The Cordeses and the Accuracy-Related Penalty Due to Negligence or Disregard of Rules or Regulations

Respondent determined in docket No. 7369-99 that the Cordeses were liable for the accuracy-related penalty due to negligence or disregard of rules or regulations, pursuant to section 6662(a) and (b)(1).

Negligence is defined as "any failure to make a reasonable attempt to comply with the provisions of * * * [the Internal Revenue Code]". Sec. 6662(c); Neely v. Commissioner, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable and prudent person would do under the

circumstances).  The term "disregard" includes "any careless, reckless, or intentional disregard."  Sec. 6662(c).  Disregard of rules or regulations is careless if the taxpayer does not exercise reasonable diligence to determine the correctness of a return position that is contrary to the rule or regulation.  Sec. 1.6662-3(b)(2), Income Tax Regs.  Disregard of rules or regulations is reckless if the taxpayer makes little or no effort to determine whether a rule or regulation exists.  Id.  Disregard of rules or regulations is intentional if the taxpayer knows of the rule or regulation that is disregarded.  Id.  Petitioners have the burden of proving that respondent's determination is erroneous and that they did what reasonably prudent people would have done under the circumstances.  Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

Petitioners' sole defenses to respondent's determination are that (1) they did not underpay their tax, and, alternatively, (2) they acted with reasonable cause and in good faith with respect to the underpayment.  We must sustain respondent's determination.

We have already decided whether the Cordeses underpaid their taxes for the taxable years before us.  To the extent the Rule 155 computation discloses an underpayment as defined in section 6664(a), the Cordeses' argument fails.  In addition, the evidence does not demonstrate that the Cordeses relied on Robert Hinman[25]

---

[25]The Cordeses also purportedly relied on Revenue Agent Ken McGee's advice.  We reject their claim because it is not credible.

or that their purported reliance on Mr. Hinman was in good faith or reasonable.  The Cordeses did not show they requested or received advice regarding these transactions, and any advice regarding those transactions that were discussed was based on incomplete and inaccurate information, information withheld by Mr. Cordes.

The facts before us simply do not establish that the reasonable cause exception in section 6664(c) applies. Therefore, the Cordeses are liable for the accuracy-related penalty due to negligence or disregard of rules or regulations for the taxable years before us, to the extent the Rule 155 computation shows an underpayment of tax.

## V.   The Fraud Penalty

Respondent determined that CFC and Mr. Cordes are liable for the fraud penalty for their 1994 and 1995 taxable years.  Section 6663(a) provides:  "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud."  Section 6663(b) provides that if any portion of an underpayment is attributable to fraud, then the entire underpayment shall be treated as attributable to fraud unless the taxpayer shows by a preponderance of the evidence that a portion was not so attributable.  Respondent has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).

A.    Cordes Finance Corp.

In 1997, respondent and CFC executed a partial agreement, Form CG-4549, wherein CFC conceded it underpaid taxes in the amount of $226,316[26] for 1994 and that $226,069 of that underpayment was attributable to fraud.  Respondent later issued a notice of deficiency to CFC in which respondent determined CFC underpaid taxes for 1994 in the amount of $554,941 ($226,316 as agreed; $328,625 in additional deficiencies) and that the entire underpayment was attributable to fraud.  Consequently, respondent determined CFC's fraud penalty for 1994 was $246,654 more than the parties had previously agreed.[27]  CFC disputes this increased fraud penalty.[28]

Respondent's determinations are typically entitled to a presumption of correctness.  When respondent alleges fraud, however, respondent must prove by clear and convincing evidence

---

[26]CFC conceded an underpayment of taxes of $226,316 for 1994 based on adjustments to CFC's bad debt expenses, bad debts charged to income, and interest expenses to John Cordes, Inc.

[27]Respondent argued in his opening brief that the only issue with regard to CFC's liability for fraud is the computation of the fraud penalties under the ordering rules of sec. 1.6664-3, Income Tax Regs.  Petitioner, however, does not appear to dispute respondent's calculation of the fraud penalties.  Petitioner disputes only the underlying deficiencies.

[28]The parties' partial agreement also included a concession by CFC to an underpayment and a fraud penalty for CFC's 1995 taxable year.  Respondent later determined in his notice of deficiency that the fraud penalty for 1995 was less than the parties had previously agreed, and CFC has not disputed that determination.  We therefore need not address the fraud issue with respect to CFC's 1995 taxable year.

that (1) there is an underpayment, and (2) at least some of the underpayment is attributable to fraud.  Shaw v. Commissioner, 27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958).  "If he carries this burden by clear and convincing evidence, * * * the correctness of the deficiencies determined by him will [again] be presumed."  Id.  This burden does not require respondent to prove each item comprising the underpayment set forth in the notice of deficiency, nor does it require respondent to prove all of the underpayment is attributable to fraud.  Sec. 6663(b); see also Shaw v. Commissioner, supra at 570; Bencivenga v. Commissioner, T.C. Memo. 1989-239.

CFC's concession of a $226,316 underpayment, of which $226,069 is attributable to fraud, satisfies respondent's burden of proving that some part of CFC's underpayment is due to fraud. Console v. Commissioner, T.C. Memo. 2001-232 (underpayment attributable to fraud deemed stipulated under Rule 91(f) for failure to prosecute can satisfy both elements of respondent's burden of proof); Wagner v. Commissioner, T.C. Memo. 1996-355 (stipulation to underpayment satisfies that element of respondent's burden of proof); Barlow v. Commissioner, T.C. Memo. 1994-11 (stipulation to underpayment satisfies that element of respondent's burden of proof and stipulation to fraud acknowledged by Court but decided on other grounds); see also Frazier v. Commissioner, 91 T.C. 1, 12-13 (1988).  Consequently, a part of CFC's 1994 underpayment is due to fraud.  Sec. 6663(b). Unless CFC establishes that a portion of the underpayment is not

- 43 -

due to fraud, we must treat the entire underpayment as attributable to fraud.  Sec. 6663(b).

CFC has the burden of showing by a preponderance of the evidence that any of respondent's determinations are erroneous or that any portion of the underpayment was not attributable to fraud.[29]  CFC has failed to meet that burden on all counts.  We, therefore, must hold that the entire underpayment, $554,941, is attributable to fraud.  Sec. 6663(b).

B.   Edmund J. Cordes

Respondent determined that the portions of Mr. Cordes's 1994 and 1995 underpayments attributable to fraud are those portions representing the unreported constructive dividend and interest income resulting from Mr. Cordes's bargain purchase of CFC's notes.  Again, the burden of proof is on respondent.  Respondent has clearly and convincingly shown that Mr. Cordes has unreported constructive dividends and interest income giving rise to

---

[29]CFC's only argument that a portion of the underpayment is not so attributable to fraud was "the taxpayer not only relied on the advice of his C.P.A. but also on the advice of the Internal Revenue Service Agent Ken McGee."  (Record cites omitted.)  While reliance on professionals can be a defense to fraud, CFC could prevail with this defense only if it showed it provided the professional with complete and accurate information.  Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986) (quoting Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172), affg. T.C. Memo. 1985-63.  The facts with which we were presented indicate just the opposite.
    CFC did not turn to professionals for any advice, let alone provide them with complete and accurate information.  The only occasion when CFC (through Mr. Cordes) obtained advice from a professional was when Mr. Cordes inquired about the deductibility of losses upon the sale of CFC's notes.  CFC has conceded those deductions were fraudulently taken.

underpayments in 1994 and 1995.  The only remaining issue is whether Mr. Cordes intended to evade the taxes on these items known to be owing by conduct intended to conceal, mislead, or otherwise prevent collection of taxes.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).  The issue is one of fact to be determined upon a consideration of the entire record.  Rowlee v. Commissioner, supra at 1123; Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  For the reasons discussed below, we hold for respondent.

Fraudulent intent can seldom be established by direct proof of the taxpayer's intention; therefore, fraud is usually established by drawing inferences from the taxpayer's entire course of conduct.  Parks v. Commissioner, 94 T.C. 654, 664 (1990); Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971).  The courts have developed several indicia or "badges" of fraudulent behavior.  Circumstantial evidence which may give rise to a finding of fraudulent intent includes:  (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) filing false documents; (8) failure to make estimated tax payments; (9) dealing in cash; (10) engaging in illegal activity; and (11) attempting to conceal illegal activity.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Clayton v. Commissioner,

102 T.C. 632, 647 (1994).  These "badges of fraud" are nonexclusive.  Miller v. Commissioner, 94 T.C. 316, 334 (1990).  The taxpayer's background and the context of the events in question may be considered as circumstantial evidence of fraud.  Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972) (citing Gano v. Commissioner, 19 B.T.A. 518, 532-533 (1930)), affg. T.C. Memo. 1970-274.

Respondent has clearly and convincingly shown that Mr. Cordes intended to evade tax known to be owing by concealing, misleading, and otherwise preventing the collection of taxes, and Mr. Cordes is therefore liable for the fraud penalty for 1994 and 1995.  We rely on the following facts in reaching our conclusion:

(1)  Respondent demonstrated that Mr. Cordes consistently over a period of several years substantially understated his income by not reporting the constructive dividends or interest income earned.  Clayton v. Commissioner, supra at 647; see also Steines v. Commissioner, T.C. Memo. 1995-261.  While this consistent underreporting alone is not enough to establish fraud, other badges of fraud are present here that make it clear Mr. Cordes's behavior was fraudulent.

(2)  Mr. Cordes repeatedly failed to cooperate with tax authorities.  Regarding Mr. Cordes's 1994 taxable year, the revenue agent assigned to the case, Ken McGee, requested from Mr. Cordes and CFC, which Mr. Cordes controlled, documents (such as the loan ledger cards) which relate to the constructive dividends and the interest income.  Mr. Cordes refused to provide the

revenue agent with CFC's books or records, refused to comply with a subsequent summons for the same books and records, and only complied with a second-chance letter to provide those documents approximately 4 months after the initial summons. The revenue agent issued two additional document requests after reviewing the initial documents, but Mr. Cordes specifically refused to provide any additional information. The revenue agent then issued a summons for those documents, as well as a summons for the books and records containing information regarding Mr. Cordes's 1995 taxable year; those summonses were issued to Eddy Ben Cordes, president of CFC, as well as to Bill Burns, Viola Burns, and Michael Heinz (other administrative personnel). The revenue agent also issued a summons to Mr. Cordes to produce his personal ledger cards. Mr. Cordes denied he had those cards and refused to comply with the summons, although Mr. Burns and Mrs. Burns had informed the revenue agent that Mr. Cordes did keep those cards. Eventually, Mr. Cordes produced 108 ledger cards in partial compliance with a judge's order. The revenue agent was later able to obtain more ledger cards from Mr. Cordes but cumulatively obtained cards pertaining to fewer than 200 of the 1,168 notes Mr. Cordes had purchased from CFC. Mr. Cordes's repeated refusals to cooperate with the revenue agent and his concealment of documents strongly indicate that Mr. Cordes's behavior was fraudulent.

(3) Mr. Cordes provided false documents to the revenue agent. Mr. Cordes, in an effort to prove there were no personal

ledger cards in excess of those already produced, provided the revenue agent with documents that purported to show that the transferred notes were properly removed from CFC's books and were not personally owned by Mr. Cordes. Those documents consisted of purported lien releases, each dated to coincide with the date the note was removed from CFC's records. The Oklahoma Tax Commission's records, however, evidenced that the liens were actually released on later dates, indicating that those notes were outstanding beyond the date CFC removed them from its records. Mr. Cordes did not deny that the Oklahoma Tax Commission's records were accurate. It appears Mr. Cordes, or someone acting on Mr. Cordes's behalf, falsified many of those records, intending to deceive the revenue agent, with the goal of evading taxes known to be owed. This is yet another strong indication of fraud.

Like CFC, Mr. Cordes's sole defense to respondent's assertion of the fraud penalty was that he reasonably relied, in good faith, on his accountant and the revenue agent. The facts pertaining to Mr. Cordes's reliance are identical to those we examined with regard to CFC. The facts presented do not allow us to find Mr. Cordes reasonably relied on professional advice in good faith. Mr. Cordes did not show that he ever requested, received, or relied on any advice with regard to the transactions at issue.

Considering all the facts and circumstances, we hold respondent has clearly and convincingly proven a portion of Mr.

Cordes's underpayment is attributable to fraud, and we conclude Mr. Cordes is liable for the fraud penalty for 1994 and 1995.

We have considered the other arguments of the parties, and, to the extent not discussed herein, we conclude that the arguments are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decisions will be entered</u>
<u>under Rule 155.</u>

APPENDIX

Summary of Conceded, Deemed Conceded, Computational,
and Settled Issues

The following is a summary of issues and/or adjustments
conceded, deemed conceded, of a computational nature, or settled.

I.   Docket No. 19027-98, Eddie Cordes, Inc.:
     A.   1992:
          1.   Respondent disallowed petitioner's deduction for a
               net operating loss carryback of $22,453 from 1995.
               In accordance with certain of respondent's
               concessions for the 1995 taxable year and for
               purposes of the Rule 155 computation, respondent
               concedes petitioner incurred a net operating loss
               in 1995 in the amount of $48,872 and that it may
               be properly carried back to 1992.
          2.   Respondent determined petitioner was liable for an
               accuracy-related penalty pursuant to sec. 6662(a).
               Respondent concedes that determination.
     B.   1994:
          1.   Respondent increased petitioner's taxable income
               by $61,435 to account for overstated costs of
               goods sold.  Petitioner concedes this adjustment.
          2.   Respondent concedes that petitioner's taxable
               income should be decreased by $31,763, pursuant to
               sec. 263A, to reflect additional costs of goods
               sold.
          3.   Respondent increased petitioner's taxable income
               by $405,724 to account for receipt of certain
               payments from Mr. Cordes.  Respondent made an
               identical adjustment in docket No. 5508-99, in
               order to protect the Government's interest.
               Respondent concedes this adjustment in docket No.
               19027-98.
          4.   Respondent concedes petitioner may be entitled to
               deduct a larger amount for charitable
               contributions for the taxable year, as and to the
               extent shown in the Rule 155 computation.
     C.   1995:
          1.   Respondent increased petitioner's taxable income
               by $83,602 to account for overstated costs of
               goods sold.  Petitioner concedes this adjustment.
          2.   Respondent concedes that petitioner's taxable
               income should be decreased by $31,764, pursuant to
               sec. 263A, to reflect additional costs of goods
               sold.
          3.   Respondent increased petitioner's taxable income
               by $211,612 to account for receipt of certain
               payments from Mr. Cordes.  Respondent made an

identical adjustment in docket No. 5508-99, in order to protect the Government's interest. Respondent concedes this adjustment in docket No. 19027-98.

4. Respondent concedes petitioner may be entitled to deduct a larger amount for charitable contributions for the taxable year, as and to the extent shown in the Rule 155 computation.

5. Respondent's adjustments computationally eliminated petitioner's net operating loss for 1994. In accordance with certain of respondent's concessions and for purposes of the Rule 155 computation, respondent concedes petitioner incurred a net operating loss for 1995, in an amount at least equal to $48,872, and that it may be carried back to petitioner's 1992 taxable year.

6. Respondent determined petitioner was liable for an accuracy-related penalty pursuant to sec. 6662(a). Respondent concedes that determination.

II. Docket No. 4816-99, Joseph P. and Jean Ann Richard:

A. 1994:

1. The parties previously agreed to increase and decrease taxable income to account for a Schedule A expense, Schedule C expenses and depreciation, Schedule E income and expenses, and the self-employment tax and the self-employment tax deduction.

2. Respondent made various computational changes to petitioners' taxable income so that the limitation of itemized deductions was increased, itemized deductions were eliminated, the standard deduction was allowed, and the exemption amount under sec. 151(d)(3) was reduced. The extent to which these changes affect petitioners' ultimate liability will be calculated in the Rule 155 computation.

B. 1995:

1. The parties previously agreed to increase and decrease taxable income to account for a Schedule A expense, Schedule C expenses and depreciation, Schedule E income and expenses, and the self-employment tax and the self-employment tax deduction.

2. Respondent made various computational changes to petitioners' taxable income so that the limitation of itemized deductions was increased, itemized deductions were eliminated, the standard deduction was allowed, and the exemption amount under sec. 151(d)(3) was reduced. The extent to which these changes affect petitioners' ultimate liability will be calculated in the Rule 155 computation.

3. Respondent increased petitioners' taxable income

by $2,258 for wage expense under sec. 45A. Furthermore, respondent allowed a credit against petitioners' tax in the amount of $2,258 for the Indian employment credit. Petitioners had requested this credit in a claim for a refund submitted to respondent. Respondent did not allow any other portion of the claimed refund. Petitioner did not address these amounts at trial or on brief, and we deem petitioners to have conceded these adjustments.

III. Docket No. 5508-99, Eddie Cordes, Inc., Successor by Merger with Cordes Finance Corp.:

A. 1994:

1. The parties previously agreed to increase taxable income for bad debt expenses and bad debts charged to income. The parties also previously agreed to decrease taxable income to reflect an interest expense payment made to John Cordes, Inc.

2. Respondent increased petitioner's taxable income by $8,564 to reflect additional gross receipts (described in the notice of deficiency as "Gross Receipts – Debit to Income). Respondent concedes this adjustment.

3. Respondent increased petitioner's taxable income by $86,160 to reflect additional gross receipts (described in the notice of deficiency as "Gross Receipts – Credits to Retained Earnings). The parties stipulated instead to increase taxable income by $66,560.

4. Petitioner concedes respondent's determination increasing taxable income by $10,380 to reflect bad debt recoveries.

5. Respondent increased petitioner's taxable income by $131,020 to reflect income from misposted receipts. The parties stipulated instead to increase taxable income by $43,673.

6. Petitioner concedes respondent's determination increasing taxable income by $71,910 to reflect income from unbooked receipts.

7. Petitioner concedes respondent's determination increasing taxable income by $88,225 to reflect payments on unidentified loans.

8. Respondent increased petitioner's taxable income by $405,724 to reflect income from unidentified sources. The parties stipulated instead to increase taxable income by $45,702.

B. 1995:

1. The parties previously agreed to increase taxable income for bad debt expenses, bad debts charged to income, and due to a disallowed net operating loss carryover from 1994. The parties also previously

agreed to decrease taxable income to reflect an interest expense payment made to John Cordes, Inc.

2. Respondent increased petitioner's taxable income by $138,424 to reflect income from misposted receipts. The parties stipulated instead to increase taxable income by $46,141.

3. Petitioner concedes respondent's determination increasing taxable income by $16,000 to reflect payments on unidentified loans.

4. Respondent increased petitioner's taxable income by $211,612 to reflect income from unidentified sources. The parties stipulated instead to increase taxable income by $45,702.

5. Respondent increased petitioner's taxable income by $27,250 to reflect an overstatement to legal and professional fees. The parties stipulated instead to increase taxable income by $5,000.

IV. Docket No. 7369-99, Edmund J. and June J. Cordes:

A. 1994:

1. The parties stipulated that for 1994, the following distributions constitute constructive dividends from ECI: $88,225 from diversion of checks from unidentified loans; $57,609 from diversion of tag refunds; and $3,826 from excess payoffs.

2. The parties stipulated that for 1994, the following distributions constitute constructive dividends from CFC: $10,380 from diversion of checks from bad debt recoveries; $71,910 from diversion of unbooked CFC income; and $45,702 from an unexplained source of funds. Respondent concedes that portion of his determination in excess of the parties' stipulation.

3. Petitioners concede receiving $14,078 in Social Security benefits in 1994. The extent to which they are taxable will be calculated in the Rule 155 computation.

4. Respondent made various computational changes to petitioners' taxable income because the increase in constructive dividends increased petitioners' taxable income so that the limitation of itemized deductions was increased, itemized deductions were eliminated, the standard deduction was allowed, and the exemption amount under sec. 151(d)(3) was reduced. The extent to which these changes affect petitioners' ultimate liability will be calculated in the Rule 155 computation.

5. Respondent determined petitioner had self-employment income, that petitioner was liable for the self-employment tax on that income, and that petitioner was entitled to a deduction for a

portion of that tax. Petitioner's liability is decided in the body of the opinion; the deduction is computational.

6. Respondent concedes petitioners may be entitled to deduct a larger amount for charitable contributions for the taxable year, as and to the extent shown in the Rule 155 computation.

7. Respondent determined petitioners were liable for the fraud penalty pursuant to sec. 6663 on the portion of the underpayment attributable to the constructive dividends and the income from self employment. Respondent concedes that Mrs. Cordes is not liable for that penalty.

B. 1995:

1. The parties stipulated that for 1995, the following distributions constitute constructive dividends from ECI: $16,000 from diversion of checks from unidentified loans; $55,088 from diversion of tag refunds; and $28,514 from excess payoffs.

2. The parties stipulated that for 1995, $45,702 from an unexplained source of funds constitutes a constructive dividend from CFC. Respondent concedes that portion of his determination in excess of the parties' stipulation.

3. Petitioners concede receiving $14,462 in Social Security benefits in 1995. The extent to which they are taxable will be calculated in the Rule 155 computation.

4. Respondent made various computational changes to petitioners' taxable income because the increase in constructive dividends increased petitioners' taxable income so that the limitation of itemized deductions was increased, itemized deductions were eliminated, the standard deduction was allowed, and the exemption amount under sec. 151(d)(3) was reduced. The extent to which these changes affect petitioners' ultimate liability will be calculated in the Rule 155 computation.

5. Respondent determined petitioner had self-employment income, that petitioner was liable for the self-employment tax on that income, and that petitioner was entitled to a deduction for a portion of that tax. Petitioner's liability is decided in the body of the opinion; the deduction is computational.

6. Respondent concedes petitioners may be entitled to deduct a larger amount for charitable contributions for the taxable year, as and to the extent shown in the Rule 155 computation.

7. Respondent determined petitioners were liable for

the fraud penalty pursuant to sec. 6663 on the portion of the underpayment attributable to the constructive dividends and the income from self employment.  Respondent concedes that Mrs. Cordes is not liable for that penalty.